FILED

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

99 AUG 17 AM 8: 36

U.S. DISTRICT COURT
N.D. OF ALABAMA

MARY JO BEVILL,                    )
                                   )
          Plaintiff,               )
                                   )
vs.                                )        CV 98-BU-1174-S
                                   )
UAB WALKER COLLEGE, et al.,        )        **ENTERED**
                                   )
          Defendants.              )        AUG 1 7 1999

---

## Memorandum Opinion

---

This cause comes on to be heard on a motion for summary judgment filed by the Defendants, the Board of Trustees of the University of Alabama ("UAB"), Dr. J. Foster Watkins ("Watkins") and Dr. Dave Abrams ("Abrams"), on March 24, 1999 (Document 22), and on a motion to strike certain affidavit testimony of the Plaintiff, Mary Jo Bevill ("Bevill"), filed by the Defendants on May 11, 1999 (Document 29). In their motion for summary judgment, the Defendants argue that the Plaintiff cannot raise a genuine issue of material fact regarding: (1) her claim against UAB that she was terminated by UAB in retaliation for engaging in protected activity under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. §§ 1981a & 2000e, et seq. ("Title VII"); (2) her claim against UAB that it attempted to revoke her unemployment compensation benefits in retaliation for filing her

35

EEOC charge under Title VII; (3) her claim against UAB that she was sexually harassed by her supervisor, Randell Pickering ("Pickering") in violation of Title VII; (4) her claim against Abrams that she was terminated in retaliation for engaging in speech on a matter of public concern in violation of the First Amendment to the United States Constitution, brought pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983; and (5) her claim against Watkins that he affirmed her termination in retaliation for having engaged in constitutionally protected speech in violation of the First Amendment, brought pursuant to § 1983.

Defendant UAB first contends that the Plaintiff fails to raise a genuine issue of material fact with regard to her retaliatory termination claim under Title VII because the matter of which the Plaintiff complained was not employment discrimination, as set forth in 42 U.S.C. § 2000e-3(a), and therefore cannot constitute statutorily protected activity.[1]  Next, UAB argues that, because the Plaintiff cannot demonstrate that she suffered an adverse employment action, she cannot assert a viable claim that UAB attempted to revoke her unemployment compensation benefits in retaliation for engaging in protected activity.   Third, UAB asserts that the Plaintiff cannot raise a genuine issue of material fact with regard to her sexual harassment claim because the conduct of her supervisor, Pickering, was not sufficiently severe or pervasive, either subjectively or objectively, to constitute harassment and because any "harassment" suffered by her was not motivated by sex.

Defendants Watkins and Abrams contend that the Plaintiff cannot raise a genuine issue of triable fact with regard to her First Amendment retaliation claims against them because neither of the two violated any constitutional right of the Plaintiff and both are protected by qualified immunity from suit in the instant case.  While the Plaintiff raises arguments against the Defendants' contentions that she cannot present a genuine issue of triable fact on her Title

---

[1]  The Defendants also contend that the Plaintiff cannot demonstrate that the legitimate, non-retaliatory reasons for the termination offered by UAB are pretext.  The same argument is raised with respect to the Plaintiff's constitutional claims against Abrams and Watkins.

VII retaliation and her First Amendment retaliation claims, the Plaintiff does not specifically argue against UAB's assertions that she cannot raise an issue of triable fact with regard to her Title VII sexual harassment claim.

Summary judgment provides the parties an invaluable opportunity to test the mettle of a case before it ever reaches trial. In evaluating a motion for summary judgment, the court assesses all of the proof the parties can bring to bear to ascertain the presence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Under Federal Rule of Civil Procedure 56, the court's determination of the propriety of summary judgment is to be tempered by a strong inclination in favor of the non-movant. Therefore, only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law is a grant of summary judgment appropriate. FED. R. CIV. P. 56(c). *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

It is the initial responsibility of the movant to inform this court of the grounds for its motion and to specifically identify those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The movant carries no meager burden, for it must illuminate for the district court, with reference to materials on file, the reasons why the non-movant cannot or does not raise a genuine issue of material fact sufficient to support a trial. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). *But see Gonzalez v. Lee County Housing Authority*, 161 F.3d 1290, 1294 (11th Cir. 1998) ("When the non-moving party bears the burden of proof on an issue at trial, the moving party need not 'support its motion with affidavits or other similar material negating the opponent's claim,' [*Celotex*] at 323 [], in order to discharge this initial responsibility. Instead, the moving party simply may '"show[ ]"' — that is, point[ ] out to the district court — that there is an absence of evidence to support the nonmoving party's case.'").

Only after the moving party has satisfied this initial burden must the nonmoving party "make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." *Howard v. BP Oil Company*, 32 F.3d 520, 523 (11th Cir. 1994). At that point, Federal Rule of Civil Procedure 56(e) dictates that the nonmoving party "go beyond the pleadings" and by "affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts'" showing there exist genuine issues for trial. *Celotex*, 477 U.S. at 324; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). "If the non-moving party fails to 'make a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' then the court must enter summary judgment for the moving party." *Gonzalez v. Lee County Housing Authority*, 161 F.3d at 1294 (11th Cir. 1998). Bare speculation based on loose construal of the evidence will not satisfy the non-movant's burden. *See id*.

While the district court is permitted to consider the offered "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" in deciding whether to grant or deny a summary judgment motion, FED. R. CIV. P. 56(c), the non-movant bears the absolute responsibility of designating the specific facts in the record that support its claims. *See United States v. Four Parcels of Real Property in Greene and Tuscaloosa Counties in the State of Alabama*, 941 F.2d 1428, 1438 (11th Cir. 1991); *Jones v. Sheehan, Young & Culp, P.C.*, 82 F.3d 1334, 1338 (5th Cir. 1996). In other words, Federal Rule of Civil Procedure 56 "does not impose upon the district court a duty to survey the entire record in search of evidence to support a non-movant's opposition." *Id*. *See also Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."), *cert. denied*, — U.S. —, 116 S.Ct. 74 (1995).

In resolving whether a given factual dispute requires submission to a jury, the court must inspect the presented evidence through the looking glass of each party's substantive evidentiary

burden. *Anderson*, 477 U.S. at 254-55. Nonetheless, the court must abstain from examining the probity of conflicting evidence and from deciding issues of credibility. *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992). "It is not part of the court's function, when deciding a motion for summary judgment, to decide issues of material fact, but rather decide whether such issues exist to be tried. The Court must avoid weighing conflicting evidence or making credibility determinations." *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993). Still though, "[t]he nonmoving party must provide more than a mere scintilla of evidence to survive a motion for judgment as a matter of law; 'there must be a substantial conflict in evidence to support a jury question.'" *Tidwell v. Carter Products*, 135 F.3d 1422, 1425 (11th Cir. 1998) (*citing Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir.1989)).

## Facts[2]

On November 21, 1996, Bevill, an employee of UAB Walker College ("College"), came into possession of photographs of a young male student of the College taken by her supervisor, Pickering.[3] To the Plaintiff, the photographs seemed unquestionably inappropriate, as they depicted the student in either bikini underwear or a swimsuit and focused on the genital regions of that student's body. She was apparently aware that the student who was the subject of the

---

[2] "The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the record." *Underwood v. Life Ins. Co. of Georgia*, 14 F.Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998). The factual narrative presented here is developed in the light most favorable to the Plaintiff and with all *reasonable* inferences drawn in support of the Plaintiff's position. *See Hunt v. Cromartie*, — U.S. —, —, — S.Ct. —, —, 1999 WL 303677 at *6 (May 17, 1999). Whether this narrative would be borne out in the facts developed at trial is an entirely separate matter. *See Cox v. Administrator United States Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994).

[3] Pickering was employed as an administrator for the recruiting and student affairs department of the College. The Plaintiff was employed as his secretary.

photographs was under consideration for a paid position as a recruiting "ambassador" for the College.[4]  The Plaintiff came to the conclusion that the photographs were the result of sexual intimidation and harassment by Pickering and called the offices of the Academic Dean, Jerry Dollar ("Dollar"), and the Interim President of the College, Abrams.  Neither individual was on the campus at the time.  Unable to reach administration officials, Bevill made copies of either four or six photographs that she found most offensive.  She put those reproductions of the photographs in her tote bag and placed the original photographs in an unlocked drawer of her desk.

That evening, the Plaintiff attended a basketball game at which the accountant for the campus in charge of payroll maintenance, Carol Morgan ("Morgan"), was present.  The Plaintiff, who allegedly considered Morgan to be both a person in authority and Abrams's assistant, sought out Morgan and showed her the copies she had made of Pickering's photographs. It is unclear whether the Plaintiff asked Morgan to pass word of the photographs to Abrams or whether she simply expected Morgan to do so on her own initiative.  The Plaintiff

_____

[4]  This testimony by Bevill in her affidavit is the subject of a motion to strike filed by the Defendants on May 11, 1999, as hearsay attributable to Pickering. However, in *Celotex Corporation v. Catrett*, 477 U.S. at 322, the Supreme Court held that the non-moving party need not produce evidence in a form admissible at trial in order to withstand a motion for summary judgment.   *See Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1015 (11th Cir. 1989). The Plaintiff's assertions can be demonstrated at the trial through the introduction of those documents to which the Plaintiff refers.  There is no reason to believe, at this stage of the litigation, that such documentation cannot be produced at trial.  In addition, the Plaintiff's affidavit is trialworthy in a limited sense.  The alleged statement by Pickering, the substance of which was that he had approved the payment of ambassadors and that the student photographed was to be one of those ambassadors, does not go to the truth of the matter asserted, but instead to the Plaintiff's good faith belief that an employee of the College was being subjected to sexual harassment.  Further, even though Pickering is no longer employed by the College, at the time of the statement, he was arguably an agent of the College (and, consequently, UAB).  Therefore, the statement by Pickering may constitute a non-hearsay admission under Federal Rule of Evidence 801(d)(2)(D).  The motion to strike (Document 29) will, therefore, be DENIED.

contends that this was the only time that she discussed with anyone or showed to anyone the offending photographs.

The following day, November 22, 1996, the Plaintiff received a telephone call from Abrams. Abrams, who had been informed about the photographs the prior evening by his secretary,[5] indicated his desire that the photographs not be made available for public distribution and stated that the Plaintiff should not discuss the existence of the pictures with anyone.[6] The Plaintiff complied by destroying the reproductions of the photographs that she had made. She then looked for the original photographs, only to discover that they had been removed from her desk and placed in Pickering's office.

Bevill also alleges that beginning on November 22, 1996, Pickering's treatment of her degraded to the point of incivility. The Plaintiff contends that Pickering alternated between berating her and ignoring her, because he believed her to be the source of the reports regarding the photographs taken of the student and of the ensuing investigation into his affairs. Allegedly, Pickering's behavior caused her to feel insignificant and alienated from her job.

On November 26, 1996, Abrams and two other deans at the College began an investigation of the appropriateness of Pickering's behavior in photographing the student and prospective ambassador. Pursuant to that investigation, Abrams interviewed Bevill on December 5, 1996. In the interview, according to notes taken by Abrams, the Plaintiff again promised to keep the matter private. After discussing the matter with other staff who had seen the photographs, Abrams gave all of the material he had collected to the incoming President,

---

[5] Abrams's secretary had been apprized of the existence of the photographs by other individuals employed by the College.

[6] In a later memorandum, the Plaintiff indicated that she had not initiated any discussion about the photographs. She stated, though, that students and other staff had approached her inquiring about the photographs Pickering had produced.

Watkins. Watkins instructed Abrams to provide the material to the UAB Human Resources department for further investigation.

As a part of the investigation undertaken by UAB Human Resources, Abrams was directed to obtain statements from those persons with whom he had previously spoken. In their statements, three people, Robert Epps, Joan Key and Millie Meadows, indicated that the Plaintiff had either told them about or shown them copies of the photographs taken by Pickering.[7] The Plaintiff, in her statement dated January 21, 1997, expressed, in great detail, her initial reaction to the photographs when they first arrived in Pickering's office, but made no mention of whether she had shown the photographs or her copies of the photographs to other people, or to whom she had shown them.

On February 13, 1997, Abrams and several individuals from UAB interviewed the Plaintiff. In the interview, Bevill discussed how the photographs had come into her possession and what she had done with the pictures once she had viewed them. The Plaintiff also reported that prior to Pickering's photography session with the student, she had been told by another student of the College that Pickering had once made sexually suggestive comments to him. After conducting interviews with the Plaintiff and other individuals who either were employed by the College or were students of the College, UAB concluded that Pickering should be dismissed from his position; he was permitted to resign in lieu of termination.

On March 4, 1997, Chris Rossi, a Human Relations Representative for UAB, telephoned the Plaintiff and asked her if she had spoken with anyone other than Carol Morgan about the photographs. Contrary to the representations of Robert Epps, Joan Key and Millie Meadows, the Plaintiff asserted that she had not. Three days later, on March 7, 1997, Abrams informed the Plaintiff that she was being removed from her position with the College and gave

---

[7] Joan Key claimed to have seen the photographs at the basketball game at which Bevill displayed the photographs to Morgan.

her the choice of resignation or outright termination. In a memorandum provided to the Plaintiff, Abrams stated:

> Mary Jo, you exercised very poor judgment regarding copying and subsequent showing of copies of pictures of a student at a basketball game to other staff members of UAB Walker. You indicated in your statements regarding the incident "for the protection of the school and all involved I tried to hide the pictures till the next morning" and "I have to[o] much concern, love and appreciation of our school and students to approve of this situation". However, this has not been exhibited by your actions. After talking to you and receiving statements from other UAB Walker employees, it has been decided that your employment with UAB Walker College will terminate effective March 7, 1997 *for the following reasons*:
> - Inappropriate Behavior in the Workplace.
> - Conduct which brings discredit to UAB and UAB Walker College.
> You should return all property of UAB Walker College immediately.

Defendants' Exhibit B, Appendix 10, at 100 (emphasis added). The Plaintiff chose to resign.

After she resigned, Bevill filed a grievance with UAB. After a hearing, the grievance committee recommended that the Plaintiff be reinstated, but disciplined. However, Watkins chose not to follow the grievance committee's recommendation, and, in a letter dated August 4, 1997, he informed Bevill that her resignation would remain in force. No reasons for Watkins's decision are given contemporaneously with the letter. Rather, Watkins simply affirmed Abrams's decision to terminate the Plaintiff.

On September 9, 1997, Bevill filed a charge with the Equal Employment Opportunity Commission, alleging that UAB retaliated against her in violation of Title VII because she complained about the photographs taken by Pickering and alleging also that she was terminated because of her age in violation of the Age Discrimination in Employment Act. No reference was made to any sexual harassment endured by her. After the Plaintiff filed the charge, UAB twice sought to entirely revoke unemployment compensation from the Plaintiff on the basis that circumstances leading to her resignation involved criminal action.[8] On both appeals, UAB lost.

---

[8] Defendant UAB also sought to have Bevill's unemployment compensation benefits reduced on the ground that she had engaged in "misconduct" by spreading information related to the pictures.

Contentions & Analysis[9]

The Plaintiff, in her complaint, raises claims of retaliation in violation of Title VII, sexual harassment in violation of Title VII and retaliation in violation of the First Amendment under 42 U.S.C. § 1983. UAB contends that the Plaintiff cannot present a genuine issue of material fact with regard to her Title VII claims and Watkins and Abrams assert, in addition to the argument that the Plaintiff can state no First Amendment retaliation claim, that they are protected by qualified immunity from liability on her First Amendment claims. Each of these arguments will be developed in turn.

I. RETALIATION CLAIMS AGAINST UAB UNDER TITLE VII.

The Plaintiff claims that Defendant UAB retaliated against her, first, when she was terminated for speaking to Abrams and others, including Morgan, about the photographs made by Pickering and second, when UAB attempted to cut off her unemployment compensation benefits based upon her filing of an EEOC charge. Defendant UAB contends that the Plaintiff cannot raise a genuine issue of material fact against it regarding either claim of retaliation in violation of Title VII.

Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. §§ 1981a & 2000e, *et seq.*, prohibits retaliation against employees who voice opposition to discrimination that is covered by Title VII or who participate in a proceeding to determine the existence of illegal discrimination. *See* 42 U.S.C. § 2000e-3(a). Regarding

---

This action was successful and the Plaintiff apparently asserts no claims concerning it.

[9] The parties, in their briefs, devote too much effort to detailing superfluous facts and far too little effort in explicating the sometimes difficult and convoluted law that applies to those facts. To the extent possible, an attempt has been made to "flesh out" the arguments of the parties in the instant case and present them in a more resolvable form.

retaliation by an employer for engaging in these protected activities, Title VII states, in relevant part:

> **(a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings**
>> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). As with an action for employment discrimination on the basis of race, sex, age, disability or other protected status, a plaintiff can prove a case of retaliatory treatment by providing direct evidence of retaliatory action, such as statements made by the decisionmaker to the effect that the plaintiff should suffer an adverse job action because she opposed discrimination. *See Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997) (finding direct evidence of retaliation where decisionmaker told employee that his deposition in an earlier case was "damning" and that, consequently, the employee no longer had a job with the employer). A plaintiff can also demonstrate that her employer retaliated against her for engaging in a protected activity through the use of circumstantial evidence. *See Taylor v. Runyon*, — F.3d —, —, 1999 WL 269674 at * 8 (11th Cir. 1999). Here, the Plaintiff has not grounded either of her claims of retaliation on the presence of direct evidence of retaliation.[10]

---

[10] Although the parties have not argued the issue, it may be the case that, if the Plaintiff has, in fact, engaged in protected activity, there exists direct evidence of retaliation with regard to Plaintiff's termination claim. Direct evidence of discrimination is evidence which, without inference or presumption, could lead a reasonable trier of fact to conclude that discrimination occurred. *Carter v. City of Miami*, 870 F.2d 578, 580-81 (11th Cir. 1989). Because "direct evidence of discrimination is powerful evidence capable of making out a prima facie case essentially by itself," the Eleventh Circuit Court of Appeals "has marked severe limits for the kind of language to be treated as direct evidence of discrimination." *Jones v. Bessemer Carraway Medical Center*, 151 F.3d 1321, 1323 n.11 (11th Cir. 1998). A few isolated words unrelated to the employee's position or to a relevant hiring, promotion or termination decision will not create direct evidence. *Id.* Further, "remarks by

Instead, Bevill seeks to support her claims of retaliation through the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) and explicated through other decisions of the Supreme Court and the Eleventh Circuit Court of Appeals.

A. TERMINATION CLAIM.

In *Sullivan v. National R.R. Passenger Corp.*, 170 F.3d 1056, (11th Cir. 1999), the Eleventh Circuit Court of Appeals set out, in short fashion, the requisites of a retaliation claim for all parties in a *McDonnell Douglas* burden-shifting circumstantial evidence case:

> To make a prima facie case for retaliation, the plaintiff must show: 1) a statutorily protected expression; 2) an adverse employment action; 3) a causal link between the protected expression and the adverse action. *See Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998); *Raney v. Vinson Guard Service*, 120 F.3d 1192, 1196 (11th Cir. 1997). Once the plaintiff makes out a prima facie case, "the burden shifts to the defendant to rebut the presumption of retaliation by producing legitimate reasons for

non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination." *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330, (11th Cir. 1998), *reh'g denied*, 172 F.3d 844 (1999).

The reason given for the Plaintiff's termination in Abrams's letter is that the Plaintiff's showing of copies of the photographs indicating that Pickering sexually harassed a student to another staff member — in particular, Morgan — constituted inappropriate behavior in the workplace and conduct bringing discredit to UAB and the College. A reasonable trier of fact could interpret this statement, winnowed down to its essentials, to be no more than that UAB terminated the Plaintiff's employment for the reason that she opposed the existence of discriminatory conduct in a manner that drew attention to the conduct. *See Claughton v. National Weight Loss Centers of Alabama, Inc.*, Denial of Motion to Reconsider, CV 97-BU-2577-S at 1 (N.D. Ala. 1999) ("All statements are made in a context; determining the meaning of a statement involves the interpretation of that statement in its context. The mere fact that, in determining the meaning of the statement by the Plaintiff's supervisor, a context must be imported does not render determination of that meaning a matter of inference. Otherwise, no utterance could qualify as direct evidence; 'inference' would be required to demonstrate that the comment was not meant in jest or was not a report of a statement by another person.") A reasonable trier of fact could find that the notice to the Plaintiff by Abrams constitutes direct evidence that she was terminated in retaliation for complaining of the alleged harassment, in that, without inference (but with interpretation), it demonstrates a retaliatory motive for the termination. *See Taylor v. Runyon*, — F.3d at —, 1999 WL 269674 at * 8 and *Merritt v. Dillard Paper Co.*, 120 F.3d at 1189.

the adverse employment action." *Raney*, 120 F.3d at 1196 (*quoting Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993)). If the defendant offers legitimate reasons, the presumption of retaliation disappears. *Id.* The plaintiff must then show that the employer's proffered reasons for taking the adverse action were actually a pretext for prohibited retaliatory conduct. *Olmsted*, 141 F.3d at 1460.

UAB does not deny that an adverse employment action was taken by it — that is, it concurs that the Plaintiff was terminated.[11] Rather, it argues that the Plaintiff's discussions related to student harassment by Pickering and her display of copies of the photographs to other employees of the College did not constitute protected expression within the meaning of § 2000e-3(a) and that, even if her actions did constitute statutorily protected activity, the Plaintiff still cannot demonstrate a causal connection between her expression and her ultimate termination.[12]

---

[11] Apparently, the Plaintiff does not raise a Title VII claim against UAB because of Watkins's ratification of the Plaintiff's termination in the letter dated August 4, 1997. This decision was perhaps the result of a misconception on the part of the Plaintiff that the termination by Abrams and its ultimate ratification by Watkins comprise part-and-parcel of a single adverse action. However, such a conclusion would be incorrect for a series of reasons. First, the adverse employment actions were performed by entirely separate parties. Second, the three-month ordeal cannot be considered a "continuing termination" — the Plaintiff's employment was over when she was terminated by Abrams. If Watkins chose not to reinstate her, that is a separate decision. Third, a grievance proceeding and its consequences do not extend the time in which a plaintiff is required to file her EEOC charge on the termination. *See Delaware State College v. Ricks*, 449 U.S. 250, 261 (1980). Fourth, and finally, it is conceivable that a jury could find either that Abrams unlawfully terminated the Plaintiff while Watkins lawfully decided not to reinstate her, thereby limiting her damages to the period in which she would have remained an employee of UAB had Abrams not terminated her or that Abrams's termination was based on a wrong reason but lawful while Watkins's refusal to reinstate was unlawful, permitting the Plaintiff to receive the full range of damages and possible reinstatement. That the interplay between the two decisions could have such drastic consequences on the relief formulated leads to conclusion that there are two adverse employment decisions at issue rather than one. At this stage of the litigation, however, the Plaintiff will not be permitted to amend her allegations to include a claim against UAB for Watkins's decision not to reinstate her.

[12] UAB's argument that there is no causal connection between the actions of the Plaintiff and her ultimate termination is based upon the argument that "her employer had legitimate non-discriminatory reasons to request her resignation." Defendants' Brief in Support of Their Motion for

UAB argues that the Plaintiff's attempts to demonstrate that she engaged in statutorily protected activity fail on two grounds. First, UAB asserts, the Plaintiff's conduct falls outside of the boundaries of the activities protected by Title VII because she was not complaining about an *employment practice* made unlawful by Title VII. Instead, she complained about teacher-on-student harassment, a matter entirely unrelated to employment. Second, contends UAB, Bevill's belief that the subject matter of the photographs taken by Pickering demonstrated activity covered by Title VII was objectively unreasonable.

To state a claim of retaliation, the plaintiff must object to conduct that, as a factual matter, touches on an *employment practice of the employer*, regardless of the reasonableness of a plaintiff's beliefs concerning whether the conduct constituted a violation of Title VII.[13] For

---

Summary Judgment at 25. As such, UAB's concerns about "causation" will be addressed alongside issues of whether UAB articulated a legitimate non-retaliatory reason for the termination and of whether the Plaintiff can demonstrate that the reasons offered for the termination are a pretext for discrimination.

[13] In actuality, the validity of this proposition is unclear. While the Eleventh Circuit and district court caselaw cited herein would indicate that a plaintiff must demonstrate, as a factual matter, that she complains of an employment practice, such has not been unequivocally stated. It may be the case that all Title VII requires of the whistleblowing employee is a reasonable good faith belief that the discrimination of which she complains is an employment practice. If the practice of which an employee complains is not, in actuality, an employment practice, it is of no consequence, except insofar as such demonstrates that the plaintiff could not have had a reasonable, good faith belief that the actions of which she complained were an employment practice.

While it could, therefore, be rationally concluded that an employee need only show that she reasonably believed an action to be an employment practice, requiring the employee to demonstrate that to which she is opposed is, in fact, an employment practice, is the better rule. Title VII strikes only at employment practices. Therefore, at its outer limits, a practice opposed as unlawful by an employee must be an employment practice. A plaintiff who complains because an employer's advertising to consumers is sexist or who complains because the employer donates solely to programs that benefit women is not protected under the anti-retaliation provision of Title VII, the purpose of which is to protect employees who voice opposition to employment practices. *See also*, the discussion of *Holt v. Lewis*, 955 F.Supp. 1385 (N.D. Ala. 1995), *infra*.

Were it the case that the Plaintiff here need only demonstrate that she reasonably believed that the unlawful practice in which UAB engaged was an employment practice, the Plaintiff would handily

example, in *Little v. United Technologies, Carrier Traniscold Division*, 103 F.3d 956, 959 (11th Cir. 1997), the Eleventh Circuit Court of Appeals held that the utterance of one racially derogatory comment by one co-worker to another co-worker was not an employment practice because the employer could not have been held responsible for the comment. As such, the complaint about the derogatory comment was not a protected activity —, i.e., opposition to an *employment practice* of the employer. *Id.* at 960.

In *Holt v. Lewis*, 955 F.Supp. 1385 (N.D. Ala. 1995), *affirmed without opinion*, 109 F.3d 771, *cert. denied*, — U.S. —, 118 S.Ct. 67 (1997), the plaintiff, a professor at Samford University, complained of the sexual harassment of a student at the University. After making this complaint, the professor's contract with the University was not renewed. Among other things, the plaintiff complained that he was terminated in violation of Title VII's retaliation provision because he had complained of harassment of the student. The district court granted the University's motion for judgment on the pleadings with regard to the claim. In coming to its conclusions, the district court, in an opinion by Judge Acker, stated:

> The initial element of plaintiff's prima facie case is "established if [he] can show that he opposed an unlawful employment practice which he reasonably believed occurred." *Bigge v. Albertsons, Inc.*, 894 F.2d 1497 (11th Cir. 1990) (emphasis added). Title VII defines an employment practice as follows:
> It shall be an unlawful employment practice for an employer--
>> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an

---

satisfy this requirement. Bevill had been informed by Pickering that the student "ambassadors" were to be paid by the College for their work and that the student who was the subject of the photographs was an "ambassador" who was going to receive payment from the College, if approved by Pickering. This raises a genuine issue of triable fact that the Plaintiff (or a reasonable person in her stead) could rationally have come to the conclusion that any harassment by Pickering was an employment practice.

> employee, because of such individual's race, color, religion, sex, or national
> origin.

42 U.S.C. § 2000e-2(a). "[I]n enacting Title VII of the Civil Rights Act of 1964,
Congress intended to prohibit all practices in whatever form which create inequality
in employment opportunity due to discrimination on the basis of . . . sex. . . ." *Franks
v. Bowman Trans. Co.*, 424 U.S. 747, 763 (1976) (emphasis added).

> Taking the facts alleged by plaintiff as true, plaintiff's complaint fails to state
a cause for retaliation for which relief can be granted under Title VII. Plaintiff alleges
that he championed the cause of "a woman student" who was "a victim of sexual
discrimination" at Samford. Complaint at ¶ 7 (emphasis added). He has not alleged
that this student was discharged from employment, not chosen for employment, or
otherwise denied any privilege of employment by Samford. Framing the allegations
of the complaint in the light most favorable to plaintiff, he has only asserted that a
female student was being unfairly treated by an instructor and that his opposition to
this treatment ultimately led to his constructive discharge. This in no way indicts any
employment practice on behalf of Samford. Without more, any retaliation by
defendant[] for plaintiff's advocacy of a student's rights is simply not prohibited by
Title VII.

*Id.* at 1387-88. The reasoning of the district court in *Holt* is persuasive; the Plaintiff's
statements — to Morgan, Abrams and UAB investigators regarding Pickering's treatment of
the subject of the photographs — concern, in large part, teacher-on-student harassment.
Nonetheless, there is a distinguishing characteristic to this action; arguably, on the
recommendation of Pickering, the photographed student either was to be paid or was paid by
the College for work done on behalf of Pickering in the recruiting and student affairs
department. Were this, in fact, to be the case, the photographed student would be an
employee protected from sexual harassment by Title VII. Therefore, if, as the Plaintiff posits,
the photographed student either was a candidate for a position with the College or occupied a
paid position with the College under the supervision of Pickering, a reasonable trier of fact
could conclude that the photographing session was a precondition interposed by Pickering to

the student's being hired into the paid position or to his continuing in that position, and hence, an employment practice within the scope of Title VII.[14]

UAB further argues that Bevill's complaints about Pickering's harassment of the student in the photographs and her display of those photographs to others was not protected activity because Bevill did not have an objectively reasonable belief that the conduct of Pickering in photographing the student constituted sexual harassment.

> Under Title VII, it is well established that an employee need not prove the underlying claim of discrimination in order to establish a retaliation claim. *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494 (11th Cir. 1989). Instead, an employee's opposition to the discrimination is protected if she can *reasonably* form a good faith belief that the alleged discrimination existed. *Tipton*, 872 F.2d at 1494.

*Taylor v. Runyon*, — F.3d at —, 1999 WL 268674 at * 7 (emphasis added). The requirement that a plaintiff's belief that discrimination occurred be reasonable is both an objective and subjective requirement. *See Standard v. A.B.E.L. Services, Inc.*, 161 F.3d at 1328 (stating that "to satisfy the first element of the prima facie case, it is sufficient that an employee have a good faith, objectively reasonable belief that his activity is protected by the statute") and *Harper v. Blockbuster Entertainment Corp.*, 139 F.3d 1385, 1388 (11th Cir. 1998) (citing *Little v. United Technologies, Carrier Transicold Division*, 103 F.3d at 960, for the proposition that "it is insufficient for a plaintiff 'to allege his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable'"). In addition, "[t]he objective reasonableness of an employee's belief that her employer has engaged in an unlawful employment practice must be measured against existing

---

[14] There exists an additional argument that the Plaintiff did not oppose an employment practice because the Plaintiff complained of harassment to the student *qua* student. However, there is no indication that the Plaintiff did any more in this case than show the photographs to Morgan and answer questions in interviews about harassment of the student. There is no requirement that the Plaintiff, in complaining of harassment, indicate that the person who is the subject of harassment is an employee, even where the victim has a dual character both as an employee and as a student.

substantive law." *Clover v. Total System Services, Inc.*, — F.3d —, —, 1999 WL 335389 at *3 (11th Cir. 1999).

   In support of its contention that the Plaintiff held an objectively unreasonable belief that the photographs demonstrated sexual harassment, UAB states:

> Foremost, Bevill did nothing beyond reviewing the photographs and having a reaction to them to substantiate her claim that student sexual harassment had taken place. For example, Bevill never reported any conversations between her and Pickering concerning the photographs and the circumstances under which they were taken, and she certainly never talked with the student who was in the photographs to obtain a full accounting of what had occurred. Instead, she based her assumption that harassment had occurred upon alleged previous conversations with students concerning Pickering's conduct, such alleged wrongful conduct that she had never reported to the administration. It is patently impossible to surmise that sexual harassment occurred from merely viewing the photographs. The individual depicted in the photographs is not nude. Bevill undertook no independent investigation to confirm her suspicions, but merely jumped to a conclusion that sexual harassment had occurred. As such, while she may have subjectively thought she was witnessing sexual harassment, such a belief was not objectively reasonable in light of the facts and circumstances as she knew them at the time she saw the subject photographs.

Defendants' Brief in Support of Their Motion for Summary Judgment at 24. In so arguing, Defendant UAB attempts to separate the photographs from their context. The Plaintiff had knowledge, through discussions with various students, of prior sexual overtures made by Pickering toward the students of the College. While the photographs in question did not depict Pickering in the act of inappropriately touching the student, they were taken of the student in either bikini underwear or swimwear and focused on the student's genital region.[15] The mere subject of the photographs, without a context, might not lead a reasonable person to the inevitable conclusion that anything unlawfully inappropriate occurred. However, context

---

   [15] Others who had viewed the photographs before they came into the Plaintiff's possession had allegedly found them to be revolting and upsetting due to their content and had apparently believed them to be consequence of harassment by Pickering.

matters; and, in the context in which the photographs were presented to the Plaintiff — that of a possible employee of the College being photographed in his underwear by his prospective supervisor, who had previously made other unwelcome and blatant sexual overtures to students[16] — a reasonable person could come to believe that sexual harassment had occurred. *Compare Clover v. Total System Services, Inc.*, — F.3d at —, 1999 WL 335389 at *4 (concluding, in dicta, that plaintiff did not have an objectively reasonable belief that conduct reported by plaintiff constituted a sexually hostile work environment where flirting noticed by plaintiff would not, under extant law, demonstrate harassment).

Defendant UAB asserts two allegedly nondiscriminatory reasons for the Plaintiff's termination. First, UAB contends, the Plaintiff was terminated because "Bevill had circulated pictures that she herself had described as 'lewd, sexually offensive and grossly inappropriate' of a minor student," Defendants' Brief in Support of Their Motion for Summary Judgment at 19. UAB also asserts that the Plaintiff was terminated for legitimate reasons because "Bevill had been untruthful in representing her involvement in the circulation of the photographs in that during the investigation she consistently represented to Abrams and UAB Employee Relations Department representatives that she had carried the copies of the photographs she had made home and had not shown them to anyone, but [later] admitted to showing them to one person (Carol Morgan)." *Id.*

In *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997), *cert. denied sub nom.*, *Combs v. Meadowcraft Co.*, — U.S. —, 118 S.Ct. 685 (1998), the Eleventh Circuit Court of Appeals stated:

> . . . The effect of the presumption of discrimination created by establishment of the prima facie case is to shift to the employer the burden of producing legitimate, nondiscriminatory reasons for the challenged employment action. *McDonnell Douglas*,

---

[16] For example, one student, Alton Davis Blanton, told Bevill that Pickering had once approached him and asked him if he would like to be "rubbed down" with "hot oil." Also, Bevill witnessed Pickering regularly try to give extended back massages to Mr. Blanton.

411 U.S. at 802 []; *Burdine*, 450 U.S. at 254. To satisfy that burden of production, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine*, 450 U.S. at 254-55, [](citation and footnote omitted). "[T]o satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Id*. at 257 [] (emphasis added).

The burden on the employer to come forward with a legitimate nondiscriminatory reason is "exceedingly light." *See Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994). Indeed, an employer "is not required to convince the district court that it was actually motivated by the reasons advanced," as "the employer bears only the burden of production, not the burden of persuasion." *Crawford v. Western Elec. Co., Inc.*, 745 F.2d 1373, 1376 (11th Cir. 1984), *reh'g denied*, 751 F.2d 394.

However, "the employer must articulate in a reasonably specific manner the legitimate, non-discriminatory reasons" for its employment decision. *Id*. In addition, the Eleventh Circuit Court of Appeals "has squarely held that an employer may not satisfy its burden of production by offering a justification which the employer either did not know or did not consider at the time the decision was made." *Turnes v. AmSouth Bank, NA*, 36 F.3d 1057, 1061 (11th Cir. 1994).[17]

The reason for the termination given by UAB that the Plaintiff was "untruthful" will be treated first. While there is evidence arguably indicating that the Plaintiff was, in fact, "untruthful" in her relations with Abrams and the individuals investigating Pickering's actions, UAB has failed to offer anything *at the present stage* beyond a meager scintilla of evidence that

---

[17] For a contrast, however, *see Trotter v. Board of Trustees of University of Alabama*, 91 F.3d 1449 (11th Cir. 1996), in which the Eleventh Circuit Court of Appeals found that although the defendant had not articulated a contemporaneous rationale for the pay disparity, evidence presented by the defendant that the decisionmaker had no apparent racial animus and had found comparator more qualified than plaintiffs satisfied the defendant's burden of producing admissible evidence of an absence of discriminatory animus. *Id*. at 1456.

such reason was offered for her termination contemporaneous with that termination. The document to which Defendant UAB refers in claiming that "untruthfulness" was a reason for the termination, drafted by Abrams, states that the "reasons *I assume* were used" by the Human Resources Department for terminating the Plaintiff included her untruthfulness in not stating that she had shown the photographs to Morgan (emphasis added). Further, no other memorandum contemporaneous with the Plaintiff's termination states her "untruthfulness" as a reason for her dismissal. In the deposition which relates to the drafting of the memorandum, no date for the memorandum is offered by Abrams; rather, the attorney speaking with Abrams offers a date which Abrams neither confirms nor denies. "Untruthfulness" as a basis for termination apparently appears as a basis for sustaining the termination in memoranda drafted after the initial termination decision. A reasonable trier of fact could, without difficulty conclude that the "untruthfulness" rationale for the Plaintiff's termination stated in Abrams's memorandum, which only speculates on a reason for the termination, cannot count as a legitimate nondiscriminatory reason for the termination, as the reason is not contemporaneous with the decision made by Abrams.[18]

Further, that "untruthfulness" became a reason for later ratification of the Plaintiff's termination by Watkins does not allow it to be considered as a basis for the earlier termination. In *Delaware State College v. Ricks*, 449 U.S. at 261, the Supreme Court held that the 180-day

---

[18] Arguably, "untruthfulness" can be treated as a legitimate non-discriminatory reason and the plaintiff has demonstrated the necessary degree of pretext by presenting evidence that would convince a reasonable trier of fact that the proffered reason was not a motivating factor, but a later offered reason. While, in the body of the opinion the issue of contemporaneousness is treated as an aspect of what a defendant must offer in positing a legitimate non-discriminatory reason, no stance is being taken on whether such a determination is part of a defendant's burden to advance a legitimate non-discriminatory reason or part of a plaintiff's demonstration of pretext. There is no need to make that determination here, although it seems, based upon the decision of the Eleventh Circuit Court of Appeals in *Turnes v. AmSouth Bank, NA*, 36 F.3d at 1061, that the burden of producing evidence that the legitimate reason is synchronous with the adverse action lies with a defendant.

period within which a plaintiff complaining of employment discrimination must file an EEOC charge begins to run on the date that the plaintiff is terminated, not the date on which the plaintiff's grievance based on the termination was denied. Similarly here, the Plaintiff's claim began to run on the date of her termination, not the date that Watkins informed the Plaintiff that he was ratifying the termination. *Id.* ("The grievance procedure, by its nature, is a remedy for a prior decision, not an opportunity to influence that decision before it is made."). On the flip side of that coin, only those reasons that were offered at the time of the termination itself can be employed to legitimize that termination. To permit otherwise would require a plaintiff to begin acting on a completed adverse employment action while allowing the employer to create post-hoc rationales for the employment action.[19]

The second averredly legitimate, nondiscriminatory reason offered by the Defendant UAB, that the Plaintiff had engaged in inappropriate behavior by showing the photographs to Morgan, also cannot constitute a legitimate nondiscriminatory reason. Taken at its worst, the reason offered by Defendant UAB is little more than a complaint that the Plaintiff engaged in protected activity through the wrong person. However, 42 U.S.C. § 2000e-3(a) does not specify that opposition to an employment practice must be made to a supervisor, or any other particular party, to constitute protected activity. Therefore, the rationale that the Plaintiff complained to the "wrong" individual is not a viable legitimate nondiscriminatory reason for the termination. To whom opposition to employment discrimination is voiced is irrelevant

---

[19] A circumstance can be envisioned in which an employee is terminated and files both a grievance and an EEOC charge on the same day. The next day, the EEOC acts to investigate the charge and analyze the reasons of the employer for terminating the employee. After the EEOC provides the employee with a "right to sue" letter, her grievance is denied, for a previously unstated non-discriminatory reason. In such a circumstance it would be clearly inappropriate for the employer to have access to a reason for the dismissal that would destroy liability that was not available for the EEOC to consider. The determination that only reasons contemporaneous with the adverse decision, not with any later ratification, can constitute legitimate, non-discriminatory reasons is a bulwark against this possibility.

when it is being voiced.  Further, UAB has presented no reason to think and there exists no reason to believe, that this mis-complaint would have been the basis for termination were her complaint not activity opposing harassment.  Had the Plaintiff complained about a broken water fountain or a student's grades, there is no doubt that the Plaintiff's complaining to the wrong member of the staff would have been considered little more than an innocuous misstep.  This is not a case in which the defendant contends that the plaintiff is not opposing harassment, but engaging in idle gossip, nor is it a case in which the reason articulated for the termination is that the manner in which the opposition to harassment was voiced caused harm to the victim of the harassment.[20]  Rather, the reason offered by Defendant UAB amounts to little more than that it terminated her because she attempted to engage in protected activity and, as such, does not even qualify as a legitimate reason.[21]  As the Plaintiff's claims of retaliatory termination against UAB have arguable merit, the Defendants' motion for summary judgment will be DENIED on this claim.

---

[20]  For example, had UAB given as a reason for the Plaintiff's termination that she had either revealed the identity of the student who was harassed or that, in showing the copies of the photographs had further complicated the student's tenure at the College, both of which were arguably available reasons for the termination, such would constitute legitimate non-discriminatory reasons, as such reasons are directed at the Plaintiff's ill-treatment of the harassed student, not her opposition to his treatment.

[21]  In fact, the articulated "reason" may amount to nothing less than an admission of retaliation on the part of UAB.

In any case, as Defendant UAB has not come forward with a legitimate non-discriminatory reason, there is no reason to evaluate whether the Plaintiff can demonstrate pretext.  In any case, though, the Plaintiff has come forward with enough evidence to convince a reasonable trier of fact that the reasons offered by Defendant UAB, even were they contemporaneous with the termination or legitimate, were a pretext for discrimination.

B.  REVOCATION OF UNEMPLOYMENT BENEFITS.

   The Plaintiff also claims that UAB retaliated against her in violation of Title VII when it attempted to revoke her unemployment benefits after she filed her EEOC charge. There is no doubt that the Plaintiff's filing of an EEOC charge constituted protected activity under the statute and that UAB's attempts at revocation of those benefits followed closely enough on the heels of the filing of the charge of discrimination to permit a reasonable trier of fact to believe that the attempts at revocation of the benefits were related to the filing of the EEOC charge. But, it does not follow from this that the attempts to revoke the Plaintiff's benefits constituted an adverse job action. A post-termination employment-related action, such as opposition to a request for unemployment benefits, may sometimes be considered an adverse employment action. *See Baker v. Summit Unlimited, Inc.*, 855 F.Supp. 375, (N.D. Ga. 1994) (stating, in the context of a retaliation action based upon the defendant's opposition to payment of unemployment compensation benefits that 42 U.S.C. § 2000e-3(a) "has been interpreted by a majority of circuits to include discriminatory acts conducted post-termination against former employees," but concluding that "initiating legal proceedings against a former employee who filed an EEOC charge may be appropriate as long as shown not to be in retaliation and brought in good faith"). However, the mere initiation of the proceedings, in and of itself, does not constitute an adverse action *unless the employer prevails*. Otherwise, the Plaintiff has not been harmed —, i.e., her right to receive unemployment benefits is unimpaired. It is, therefore, the case that Bevill cannot state a claim of retaliation based upon UAB's actions in attempting to deny unemployment compensation benefits to her. The Defendant's motion for summary judgment on this issue will be GRANTED. The Plaintiff's claim of retaliations premised on UAB's attempts to deny unemployment compensation benefits will be DISMISSED, with prejudice.

II. SEXUAL HARASSMENT.

The Plaintiff claims that she was subjected to sexual harassment by Pickering for which UAB is liable. Allegedly, after Pickering discovered the Plaintiff's knowledge of the photographs he had taken of the student, Pickering began to belittle the Plaintiff, yell at her and treat her as insignificant. UAB contends that the facts, as presented by the Plaintiff, do not support her claim of sexual harassment against it, first, because the comments were not severe and pervasive enough to create a hostile and abusive workplace and, second, because, whatever else his motivations may have been, Pickering's rude treatment of the Plaintiff was not based upon sex. In her reply brief, the Plaintiff does not respond to UAB's contention that the Plaintiff cannot state a claim of sexual harassment in violation of Title VII against it. Therefore, in order to prevail on summary judgment, UAB need only present some factual grounds supporting its arguments that the Plaintiff does not raise a genuine issue of material fact on the disputed elements of her sex harassment claim —, i.e., it must present some meager factual support for either its argument that Pickering's action was not sufficiently severe and pervasive or its claim that the harassment was not based upon sex. *Celotex Corp. v. Catrett*, 477 U.S. at 323. UAB has put forward sufficient evidence to demonstrate the absence of a genuine issue of triable fact that Pickering's treatment of the Plaintiff was motivated by sex. Because the harassment of the Plaintiff, to the extent that such occurred, is not rooted in sex, Bevill's claim of sexual harassment fails. *See Oncale v. Sundowner Offshore Services, Inc.*, — U.S. —, —, 118 S.Ct. 998, 1002 (1998). Therefore, the Defendants' motion for summary judgment with respect to this claim will be GRANTED and the Plaintiff's claim of sexual harassment against UAB in violation of Title VII will be DISMISSED, with prejudice.


III. RETALIATION IN VIOLATION OF THE FIRST AMENDMENT.

The Plaintiff claims that Defendant Abrams retaliated against her in violation of her First Amendment free speech rights, actionable under 42 U.S.C. § 1983, by terminating her after

she complained about Pickering's sexual harassment both "publicly" to Morgan when she displayed to Morgan copies of photographs that indicated sexually inappropriate conduct by Pickering and "privately" when Bevill was interviewed by Abrams and UAB.[22] She also claims that Defendant Watkins retaliated against her by ratifying her termination in the grievance proceeding for engaging in the same constitutionally protected activity. The bases for her retaliation claims against Watkins and Abrams are essentially the same as those given for her Title VII retaliatory termination claim. She seeks to have Abrams found liable because he initially terminated the Plaintiff on account of her actions and to have Watkins found liable because he ultimately ratified the termination on grounds that were retaliatory.

Beyond the argument that the Plaintiff cannot raise a genuine issue of triable fact on the substantive constitutional claims — an argument which repeats many of the contentions raised by UAB in its argument with regard to its liability under Title VII already considered herein,[23] Abrams and Watkins also contend that they enjoy qualified immunity from suit on Plaintiff's First Amendment retaliation claims. The Plaintiff responds that she has stated a claim that her

---

[22] As the Defendants note, it is unclear whether the Plaintiff is suing Watkins and Abrams in their official capacities as presidents of the College, and, hence, UAB, or in their individual capacities as the persons making the decision to terminate the Plaintiff, or both. However, if the Plaintiff is asserting claims against Watkins and Abrams in their official capacities, it can only be to obtain prospective injunctive relief, that is, an injunction to return the Plaintiff to her position with the College in its present form. As the structure of the University of Alabama system has changed since the Plaintiff's termination, the Plaintiff may be incapable of obtaining the requested relief from the named parties. However, such matter has not been raised and there exists no reason to address it here. Only those claims against Abrams and Watkins in their individual capacities will be examined.

[23] In rebuffing the Plaintiff's actual constitutional claim, Abrams and Watkins only raise issues corresponding to the "statutorily protected activity" element of the Title VII claim, i.e., whether the Plaintiff's conduct involved constitutionally protected expression. Beyond that issue, the arguments of Abrams and Watkins regarding to Plaintiff's actual First Amendment claim (as opposed to qualified immunity), parallel those that UAB raised with regard to its liability in the Plaintiff's Title VII retaliation claim. However, the issue of whether Watkins's ratification constitutes an employment decision under present law will be examined, insofar as it affects the qualified immunity determination in the instant action.

First Amendment free speech rights were violated and that neither Watkins nor Abrams is entitled to qualified immunity in the instant action.

> . . . [Section] 1983 allow[s] a plaintiff to seek money damages from government officials who have violated his Fourth Amendment rights. *See* § 1983 []. But government officials performing discretionary functions generally are granted a qualified immunity and are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).
>
> . . . A court evaluating a claim of qualified immunity "*must* first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Conn v. Gabbert*, 526 U.S. —, — (1999) (slip op., at 4). This order of procedure is designed to "spare a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit." *Siegert v. Gilley*, 500 U.S. 226, 232 [] (1991). Deciding the constitutional question before addressing the qualified immunity question also promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public. *See County of Sacramento v. Lewis*, 523 U.S. 833, 840-842, n. 5, (1998).

*Wilson v. Layne*, — U.S. —, —, — S.Ct. —, —, 1999 WL 320817 at *4 (May 24, 1999) (emphasis added).[24] The first issue to be addressed will be that of whether the Plaintiff can demonstrate the existence of a constitutional right violated by Watkins and Abrams. If it is

---

[24] *Nolin v. City of Albertville*, — F.Supp.2d —, —, 1999 WL 183803 (N.D. Ala. 1999), indicated that in light of the Eleventh Circuit Court of Appeals decision in *Santamorena v. Georgia Military College*, 147 F.3d 1337, 1343 (11th Cir. 1998), a district court has "the option to avoid a difficult constitutional question in a case in which it is obvious that no right was clearly established at the time of a defendant's actions." Another panel of the Eleventh Circuit Court of Appeals later stated that while there existed no mandate from the Supreme Court that a district or appellate court must treat the issue of whether a constitutional right exists prior to addressing qualified immunity, that to do so was the "better approach." *Brown v. Cochran*, 171 F.3d 1329, 1332 (11th Cir. 1999). In light of the language of *Conn v. Gabbert*, 526 U.S. —, — (slip op., at 4), and *Wilson v. Layne*, — U.S. —, —, — S.Ct. —, —, 1999 WL 320817 at *4, it is clear that the Supreme Court has stated, in no uncertain terms, that a court considering a claim of qualified immunity *must* address the issue of whether, under present law, a constitutional right exists *prior* to addressing the issue of qualified immunity.

determined that the Plaintiff states a constitutional claim under existing law, it will then be determined whether such right was clearly established at the time of the alleged violation —, i.e., on or before March 7, 1997, as to the claim against Abrams and on or before August 4, 1997, regarding the claim against Watkins.

A. CONSTITUTIONAL VIOLATION.

The First Amendment to the Constitution of the United States, as incorporated through the Due Process Clause of the Fourteenth Amendment, limits the power of a state or local government to regulate the ability of its citizens to engage in free expression. *Fiske v. Kansas*, 274 U.S. 380, 386-87 (1927). The government's power to quash the unflattering speech of a private individual is greatly circumscribed; however, its power to restrict the unfavorable commentary of its employees in matters related to employment is somewhat more broad. *See United States v. National Treasury Employees Union*, 513 U.S. 454, 465-66 (1995); *Waters v. Churchill*, 511 U.S. 661, 671 (1994)("the government as employer . . . has far broader powers than does the government as sovereign") (plurality opinion). While "a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression," *see Connick v. Myers*, 461 U.S. 138, 142 (1983), "private speech that involves nothing more than a complaint about a change in the employee's own duties may give rise to discipline without imposing any special burden of justification on the government employer." *United States v. National Treasury Employees Union*, 513 U.S. at 466.

The Supreme Court developed the law pertaining to a litigant's claims of retaliation in violation of the First Amendment in the cases of *Pickering v. Board of Education of Township High School District 205, Will County, Illinois*, 391 U.S. 563, 568 (1968) and *Connick v. Myers*, 461 U.S. 138. In *Pickering*, the plaintiff published in the local newspaper a letter critical of certain funding policies of the school at which she was employed. After publication of the letter, the plaintiff was terminated. She then filed an action against the school board for a violation of the

First Amendment. The plaintiff's claim of retaliation, which had been rejected at the state court level, was accepted by the Supreme Court. The Supreme Court stated that, while a government employee should not be required to sacrifice the First Amendment rights she would otherwise enjoy because of her employment by the government, "it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering v. Board of Education of Township High School Dist. 205, Will County, Illinois*, 391 U.S. at 569. Attempting to strike that balance, the Court first noted that the matters of the speech at issue were of public concern. *Id*. It also drew attention to the fact that the plaintiff's statements did not upset the inner workings of the defendant school board and did not hinder a confidential relationship between the school and its employees. *Id*. This being the case, the Court concluded that the school board could not retaliate against the plaintiff for her speech. *Id*.

In *Connick v. Myers*, 461 U.S. 138, the plaintiff, an assistant district attorney in the City of New Orleans, Louisiana, was terminated by the district attorney, Harry Connick,[25] for circulating in the district attorney's office a survey which included questions concerning whether the assistant district attorneys felt pressured to work for the campaigns of the district attorney. The plaintiff filed an action claiming that Connick had retaliated against her in violation of the First Amendment. The district court found that the plaintiff was entitled to relief and the Fifth Circuit Court of Appeals affirmed. On appeal, the Supreme Court reversed. The Court first stated that "[w]hen employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Id*. at 146. Only in an exceptional circumstance, the

---

[25] Not only a popular and well-known district attorney of the City of New Orleans, Louisiana, Harry Connick is also the father of a well-known crooner of the same name.

Court observed, would an employee be able to present a First Amendment retaliation claim to a federal court. *Id*. at 147. The Court determined, however, that one element of the plaintiff's questionnaire did involve a matter of public concern, the question regarding whether assistant district attorneys felt pressured to work on Connick's political campaign.

The Court, although finding a matter of public concern, stated that the plaintiff's interest in raising that concern needed to be balanced against countervailing concerns of "the government's interest in the effective and efficient fulfillment of its responsibilities to the public." *Id*. The Court noted that the questionnaire at issue had the potential to upset office affairs and lead to a mini-insurrection in the office. *Id*. at 152-53. It also pointed out that the context of the plaintiff's speech indicated that the speech was meant to question the authority of the office. *Id*. Concluding that the balance between the plaintiff's interest in speaking and the government's interest in "effective and efficient" government administration fell on the side of the government, the Court dismissed the plaintiff's claim.

In *Beckwith v. City of Daytona Beach Shores, Fla*., 58 F.3d 1554, 1563-64 (11th Cir. 1995), the Eleventh Circuit Court of Appeals summed up, in a concrete form, the *Pickering-Connick* analysis:

> The First Amendment protects government employees from some, but not all, restraints on their right of free expression. *See, e.g.*, *United States v. National Treasury Employees Union*, — U.S. —, —, 115 S.Ct. 1003, 1012 [] (1995); *Pickering v. Board of Ed.*, 391 U.S. 563, 568 [] (1968). This Circuit examines First Amendment retaliatory discharge claims under the four part test announced in *Bryson v. City of Waycross*, 888 F.2d 1562 (11th Cir. 1989). *Tindal*, 32 F.3d at 1539; *Morgan*, 6 F.3d at 754. The *Bryson* test examines (1) whether the employee's speech involves a matter of public concern, (2) whether the employee's interest in speaking outweighs the government's legitimate interest in efficient public service, (3) whether the speech played a substantial part in the government's challenged employment decision, and (4) whether the government would have made the same employment decision in the absence of the protected conduct. *Bryson*, 888 F.2d at 1565-66.

Abrams and Watkins deny that they can be held liable in the instant action, (1) because the Plaintiff's speech and her distribution of the photographs did not touch on a matter of public

concern and (2) because Bevill's interest in speaking did not outweigh the College's interest in efficient public service. The Plaintiff responds that her speech concerning sexual harassment touched on a public concern and that her interest in speaking out about such harassment clearly outweighed any interest of the College in efficient public service. The issue of whether the Plaintiff's speech played a substantial or determining role in either the termination by Abrams or the ratification of the termination by Watkins will also be addressed.

### 1. Whether the Plaintiff's speech touched on a matter of public concern.

As an initial matter, in resolving the Plaintiff's First Amendment retaliation claim, it must first be determined whether the Plaintiff's speech touched on a matter of public concern. *Rankin v. McPherson*, 483 U.S. 378, 384 (1987); *Morris v. Crow*, 142 F.3d 1379, 1381 (11th Cir. 1998); and *Merriweather v. Alabama Dept. of Public Safety*, 17 F.Supp.2d 1260, 1278 (M.D. Ala. 1998). A state or municipality cannot freely terminate an employee or condition any aspect of public employment on her speech involving matters of public concern. *Rutan v. Republican Party of Illinois*, 492 U.S. 62, 74 (1990). However, "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick v. Myers*, 461 U.S. at 147.

In deciding whether the speech of the Plaintiff regarding Pickering's sexual harassment of students touches on a matter of public concern, other cases relevant to the question that have been decided by the Eleventh Circuit Court of Appeals will be first examined. The first of these cases is *Deremo v. Watkins*, 939 F.2d 908 (11th Cir. 1991). In *Deremo*, the plaintiffs, in a private meeting, complained to the Clerk of the Circuit Court of Lake County, Florida, about harassment from their supervisor. The clerk requested the plaintiffs to remain quiet about the harassment and told them that they would be compensated for being subjected to the

harassment. The clerk then approached the allegedly harassing supervisor, who resigned in lieu of termination. Six months later, the plaintiffs sent letters to the clerk, indicating that they still expected compensation for enduring the harassment. Immediately after the letters were delivered, the plaintiffs were terminated. *Id*. at 909. The plaintiffs filed suit, claiming that they had been subjected to retaliation for speaking about sexual harassment. At a trial on the retaliation claim, the district court entered a directed verdict for the defendants.

The Eleventh Circuit Court of Appeals affirmed the district court, finding that the plaintiffs' speech in writing the letters did not touch on a matter of public concern. The Eleventh Circuit Court of Appeals first noted various factors to be considered in analyzing whether the speech of the employee touched on a matter of public concern:

> In applying the "content, form, and context" analysis, the Supreme Court has directed courts to consider whether the speech at issue was made in the employee's role as citizen or as employee. *Connick*, 103 S.Ct. at 1690. In addition, courts have considered "the employee's efforts to communicate his or her concerns to the public" and "the content of the speech." *Kurtz*, 855 F.2d at 727. Also relevant is the employee's motivation in speaking. *Ferrara*, 781 F.2d at 1515.

*Id*. at 910-11 (footnotes omitted). Because the plaintiffs had been requested by the administration to keep the matter discrete, the *Deremo* court chose not to weigh the public communication factor against the plaintiffs. *Id*. at 910 n.3. However, the *Deremo* court concluded, the speech in question did not involve a public concern:

> . . . All three letters mentioned the sexual harassment of appellants by Don Peroddy. Deremo's letter expressed her disappointment regarding her lack of promotion to Peroddy's former position, and the letters by Fox and Mills referred to their compliance with Watkins' request that appellants remain silent about the Peroddy situation. The action requested by the letters was in the form of individual compensation to each respective signatory.
> We assume that an employee's complaint to a superior reporting the wrongful conduct of a public official, including sexual harassment, would ordinarily be a matter of public concern. We also assume that the public concern aspect would not ordinarily be negated by the fact that the employee seeks compensation in addition to elimination of the wrongful conduct. In this case, however, appellants wrote the letters seeking compensation approximately six months after Watkins had eliminated

the atmosphere of sexual harassment. Peroddy had resigned six months before the letters were written, and the record reflects that the atmosphere in the office thereafter had been completely free of that problem. The context in the instant case suggests that the claims for compensation were purely personal and unrelated to any purpose to serve the public goal of insuring that public offices are free of sexual harassment.

Not only were the letters seeking compensation written six months after the problem in the office had been completely resolved, but the immediate triggering event for writing the letters was appellants' learning via a newspaper article that personal compensation had been awarded in another sexual harassment case. Appellants failed to carry their burden of proof in the district court of establishing that their letters implicated a matter of public concern. Under the particular circumstances of this case, we conclude that appellants' letters constitute speech made in appellants' own personal interest, rather than speech implicating a public concern.

*Id.* at 911.

In *Morgan v. Ford*, 6 F. 3d 750, 751 (11th Cir. 1993), the plaintiff contended that she was subjected to sexual harassment from her supervisors and brought a claim under 42 U.S.C. § 1983, contending "that when she exercised her First Amendment right of free speech and complained about the sexual harassment, these supervisors retaliated against her." In analyzing her claim, the Eleventh Circuit Court of Appeals first discussed what types of speech by an employee would generally touch on a matter of public concern:

> To fall within the realm of the "public concern," an employee's speech must "relat[e] to a[ ] matter of political, social, or other concern to the community." *Connick v. Meyers*, 461 U.S. 138, 146 [] (1983). Absent extraordinary circumstances, however, First Amendment protection remains unavailable when "a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest. . . ." *Id.* at 147 []. A court must therefore discern the purpose of the employee's speech — that is, whether she spoke on behalf of the public as a citizen, or whether the employee spoke for herself as an employee. Id. at 146 []; *Kurtz*, 855 F.2d at 730; *Ferrara*, 781 F.2d at 1515-16. To accomplish this, a court considers "the content, form and context of a given statement, as revealed by the whole record." *Deremo v. Watkins*, 939 F.2d 908, 910 (11th Cir. 1991) (citing *Connick*, 461 U.S. at 147-48[]). A court may consider the employee's attempts to make the concerns public, along with "the employee's motivation in speaking." *Id.* at 911 (citations omitted).

*Id.* at 754 (footnotes omitted).

While the Eleventh Circuit Court of Appeals noted that "the general subject of sexual harassment in the workplace is a matter of public concern," *id.* at 755 n.7, it concluded that the plaintiff's speech in that specific case did not involve a matter of public concern.

> In the case at hand, Morgan's speech largely focused upon how Ford behaved toward her and how that conduct affected her work. The speech that Morgan cites is in the form of complaints to official bodies — the Superintendent of ACMI, Internal Affairs, and the Office of Fair Employment Practices. She did not relate her concerns about sexual harassment to the public, or attempt to involve the public in any manner. Morgan's expressions "in no way dr[ew] the public at large or its concerns into the picture." *Pearson v. Macon Bibb County Hosp. Auth.*, 952 F.2d 1274, 1279 (11th Cir. 1992). The record shows that Morgan's speech was driven by her own entirely rational self-interest in improving the conditions of her employment. Her complaints about Ford's behavior, as serious as they were, centered around her private matters, not matters of social interest. As an employee grievance, Morgan's speech was not a matter of public concern. *See Connick*, 461 U.S. at 146-47 []; *Ferrara*, 781 F.2d at 1512; *Renfroe v. Kirkpatrick*, 722 F.2d 714, 715 (11th Cir.), *cert. denied*, 469 U.S. 823 [] (1984).

*Id.* at 755. Further, the fact that the plaintiff briefly mentioned the harassment of a co-employee as a secondary matter did not change the calculus of the Eleventh Circuit Court of Appeals. Recognizing that "[a]n employee's speech will rarely be entirely private or entirely public" and that speaking out about sexual harassment of a co-employee "contains a public concern aspect," it nonetheless concluded that in light of the entire record, the plaintiff "spoke as an employee in order to improve her work environment" and her speech "took the form of a private employee grievance." *Id.*[26]

---

[26] In *Azzaro v. County of Allegheny*, 110 F.3d 968, 979-80 (3rd Cir. 1997) (en banc), the Third Circuit Court of Appeals, in an en banc opinion, discussed *Morgan v. Ford* in distilling, and rejecting as controlling, factors that are generally analyzed in determining whether complaints of sexual harassment in the workplace rise to the level of speech on a matter of public concern:

> . . . [W]e have considered several distinctions that other courts of appeals have found to be controlling on the issue of whether a public employee's speech is speech of public concern. Although in each instance we find relevance in the factor relied upon by our sister courts, we respectfully decline to give those factors controlling significance.

> A distinction has been suggested between speech uttered by a public employee

"as an employee" and speech uttered by a public employee "as a citizen." *See, e.g.,* *David v. City and County of Denver*, 101 F.3d 1344, 1355 (10th Cir. 1996) (stating that this distinction is "the fundamental inquiry" in deciding whether speech involves matter of public concern). An employee speaks as an "employee," it is said, when her primary purpose is to secure relief for herself, and as a "citizen" only when her primary purpose is to bring about systemic reform. *See id.* at 1356. Under this view, if the employee's purpose was primarily to solve her own personal problem, the fact that her statement would be of value to the process of self-governance does not make the speech public concern speech. *See, e.g., Morgan v. Ford*, 6 F.3d 750, 754 (11th Cir.1993).

The distinction between speaking as a citizen and speaking as an employee, then, is simply an alternative way of describing the inquiry into the speaker's motive. While, as we have explained, an employee's motive may be relevant to whether speech is on a matter of public concern, giving controlling significance to "primary purpose" is inconsistent with the result in *Connick*. Myers' purpose in asking her question about pressure to participate in political campaigns was no different than her purpose in asking her questions on the same questionnaire about office morale and the general reputation of the office supervisors for trustworthiness. Her purpose with respect to each of these questions was clearly "to gather ammunition for another round of controversy with her superiors." 461 U.S. at 148, 103 S.Ct. at 1691. Nevertheless, the question regarding pressure to campaign was speech about a matter of public concern because, even taking into account its form and context, it was important to a self-governing society that public employees be free to express themselves about it. As the Court explained:

> [T]here is a demonstrated interest in this country that government service should depend upon meritorious performance rather than political service. Given this history, we believe it apparent that the issue of whether assistant district attorneys are pressured to work in political campaigns is a matter of interest to the community upon which it is essential that public employees be able to speak out freely without fear of retaliatory dismissal.

*Id.* at 149 [] (emphasis added) (citations omitted).

The *Azzaro* court also noted the existence of a dichotomy between "situations in which the employee is seeking to bring information to the attention of the public and those in which the employee did not want her speech to be publicly circulated." *Id.* at 980. It stated that, while such is a factor to be examined, it should not be given controlling weight in determining whether certain speech touches on a matter of public concern. *Id.* at 980. Finally, the *Azzaro* court noted a distinction between those cases in which a plaintiff complains of systemic harassment of more than one employee and those cases in which the employee complains only of a single incident or set of incidents directed at herself. Rejecting that distinction as a governing consideration, the Third Circuit Court of Appeals stated that reporting a single incident of harassment to oneself could constitute speech on a matter of public concern. *Id.*

The plaintiff in *Tindal v. Montgomery County Commission*, 32 F.3d 1535 (11th Cir. 1994), *reh'g and reh'g en banc denied*, 42 F.3d 646, brought an action claiming that she had been terminated by the sheriff's department after testifying in a suit charging the local sheriff with sex and race discrimination. The sheriffs filed a motion for summary judgment, claiming that they were entitled to qualified immunity. The district court denied the request for immunity and the defendants appealed. The Eleventh Circuit Court of Appeals determined that the speech of the plaintiff — testimony on behalf of a litigant in a civil rights action — touched on a matter of public concern, and distinguished the case from *Morgan v. Ford*.

> Tindal's speech took place in a public forum (a federal district court proceeding), not in a private context; it also supported the discrimination and harassment claims of other individuals, not of Tindal herself (as Tindal was not a plaintiff and could not recover damages if the suit succeeded). Tindal's testimony, therefore, did not constitute an employee grievance motivated merely "by her . . . rational self-interest in improving the conditions of her employment." *Morgan*, 6 F.3d at 755 (holding that statement challenging sexual harassment, determined to be employee grievance driven by self-interest, was not matter of public concern). Instead, Tindal's testimony on behalf of her co-workers constituted speech touching upon a public concern; it thus merited First Amendment protection. *See Marshall v. Allen*, 984 F.2d 787, 796-97 (7th Cir. 1993) (denying qualified immunity to employing officials who fired male employee after he supported female coworkers in their sexual discrimination lawsuit against their mutual employer).

*Id.* at 1539.

---

It appears that the *Azzaro* court, if it meant to impart to the Eleventh Circuit Court of Appeals a narrow-minded adherence to dichotomous factors in analyzing First Amendment retaliation claims, has misconstrued the approach developed by the Eleventh Circuit Court of Appeals in evaluating the public concern issue. First, none of the factors listed by the *Azzaro* court has "controlling" weight in the determination of whether an employee's speech touches on a matter of public concern in the Eleventh Circuit. Rather, reference to those factors has been used to explain why, in a given circumstance, speech having an ostensibly public content is driven to private ends that are unrelated to the public character of the speech. *See Morgan v. Ford*, 6 F.3d at 755 (holding that the plaintiff's speech was directed to resolution of purely private matters of concern, even though speech was public in content).

*Watkins v. Bowden*, 105 F.3d 1344, 1346-48 (11th Cir. 1997), involved claims by a plaintiff that she had been terminated in retaliation for complaining about race and sex discrimination to which she had been subjected as an employee of the DeKalb County Solicitor's office.  The district court granted a directed verdict on the First Amendment retaliation claim.  On appeal, the Eleventh Circuit Court of Appeals affirmed, concluding that the plaintiff's private complaints to her supervisors about the harassment to which she was subjected did not constitute a matter of public concern.  *Id.* at 1352.

> . . . Watkins [the plaintiff] lodged her complaints to Howard privately and informally, and those complaints focused primarily on how her colleagues "behaved toward her and how that conduct affected her work."  *Morgan*, 6 F.3d at 755. Moreover, Watkins's discussions with Blum, Adams, and Dr. Moore did not draw the public at large or its concerns into the picture.  *Morgan*, 6 F.3d at 755.  Indeed, Dr. Moore's testimony revealed that he initiated their discussions about the office's environment.  Furthermore, Watkins's expression of concern over her colleagues' treatment of Emken was made in her capacity as employee, rather than in her "role as citizen."  *Kurtz v. Vickrey*, 855 F.2d 723, 727 (11th Cir. 1988).
>
> * * *
>
> Watkins's other First Amendment claim, which alleges that Bowden (and thus the county) terminated her in retaliation for her complaint about the bar luncheon speaker, fails for the same reason.  Watkins's informal and private comment to Bowden that she found the speaker's comments offensive, without more, does not constitute speech affecting a matter of public concern.

*Id.* at 1353-54.

A case marginally similar to this case is *Wallace v. School Board of Orange County, Fla.*, — F.Supp.2d —, —, 1998 WL 1032572 (M.D. Fla. 1998), a recent district court case interpreting the Eleventh Circuit's law on the issue of when the speech of an employee touches on a matter of public concern.  In *Wallace*, the plaintiff filed an action against the county school board alleging that he was retaliated against for speaking to an EEO specialist for the school board about race discrimination at one of the school board's facilities.  The school board filed a motion for summary judgment, which the district court granted.  The district court's conclusion that the plaintiff's First Amendment retaliation claim failed was based upon a

determination that his speech did not involve a matter of public concern. In coming to this result, the court relied on the fact that the plaintiff's statements "were given privately and he made no attempt to 'draw the public at large or its concerns into the picture.'" *Id*. at * 4 (internal citations omitted). Further, the court stated, "The statements were not made in a public forum and they did not involve a breach of the public trust or political matters." *Id*. Finally, the district court found persuasive the fact that the speech was initiated by the school board, not by the plaintiff. *Id*.

In respectful disagreement, the salient issue is whether the *speech* in question is about a matter of public concern —, i.e., whether the content and purpose of the *speech* indicate a public concern. The identity of the speaker and her audience are irrelevant except insofar as they provide the context by which the *speech* is determined to have a public character. *See Connick v. Myers*, 461 U.S. at 147-48 ("Whether an employee's *speech* addresses a matter of public concern must be determined by the *content, form, and context of a given statement*, as revealed by the whole record." (Emphasis added.)); *Kurtz v. Vickrey*, 855 F.2d 723, 727 (11th Cir. 1988) ("Although an employee's efforts to communicate his or her concerns to the public are relevant to a determination of whether or not the employee's *speech* relates to a matter of public concern, focusing solely on such behavior, or on the employee's motivation, does not fully reflect the Supreme Court's directive that the content, form, and context of the *speech* must *all* be considered." (Emphasis added.)).[27]

Given the context in which the Plaintiff in this case complained, her complaints in UAB's investigation and her displays to Morgan of copies of the photographs taken by Pickering touched on matters of public concern. First, the speech of the Plaintiff was about sexual

---

[27] There is the further difficulty that under the *Pickering* analysis as presented in *Wallace v. School Board*, no plaintiff could prevail. The plaintiff who complained silently would be deemed to have not acted on a matter of public concern, while the government's interests in promoting efficiency enunciated in the second part of the *Pickering* test would be paramount to those of the plaintiff who does not attempt to present its concerns in a quiet manner.

harassment, which is, as a general matter, a subject of public concern. *Morgan v. Ford*, 6F.3d at 755 n.7. As such, the content of the speech clearly involved a matter of public concern. Only if the circumstances of the speech indicate that it was not made in order to bring a focus on the issue —, i.e., that the speech was made to obtain redress for a personal and private employment grievance — will the speech activity in question be considered not to touch on a matter of public concern. In the instant case, there is no indication that the Plaintiff's speech was about a private grievance with Pickering. Indeed, until she spoke about the pictures with others, the Plaintiff had no grievances with Pickering. Bevill's expression concerned the sexual harassment of several others, not herself, at the hands of Pickering. *See Tindal v. Montgomery County Commission*, 32 F.3d at 1539 (noting that plaintiffs' statements involved public concern where there was neither self-interest nor a private grievance involved). The Plaintiff's alleged attempts at discretion were not made because the subject matter of the speech involved a private concern; rather, she kept the matter quiet because it was a matter that, if it made its way to the public, could be damaging to the public stature of the College. *See Givhan v. Western Line Consol. School Dist.*, 439 U.S. 410, (1979) ("This Court's decisions in *Pickering*, *Perry*, and *Mt. Healthy* do not support the conclusion that a public employee forfeits his protection against governmental abridgment of freedom of speech if he decides to express his views privately rather than publicly. While those cases each arose in the context of a public employee's public expression, the rule to be derived from them is not dependent on that largely coincidental fact."). *Also see Connick v. Myers*, 461 U.S. at 148 n.8 ("the right to protest racial discrimination — a matter inherently of public concern — is not forfeited by her choice of a private forum") and *Kurtz v. Vickrey*, 855 F.2d at 727 ("a public employee's freedom of speech is not sacrificed merely because the employee 'arranges to communicate privately with his employer rather than to spread his views before the public.'"). Further, the Plaintiff was instructed to keep the matter discreet; that the Plaintiff did not raise the matter publicly after the instruction from the

interim College president to remain quiet about Pickering's behavior is not to be held against her. *See Deremo v. Watkins*, 939 F.2d at 910 n.3.[28]

Further support of this conclusion lies in *Marshall v. Allen*, 984 F.2d 787 (7th Cir. 1993). In *Marshall*, one of the plaintiffs, Marshall, voiced opposition to sex discrimination of which four female employees of the Chicago Housing Authority's legal department had allegedly been the targets. None of his statements was made in a broad public forum; rather, his statements were presented solely to counsel for and members of the Chicago Housing Authority. After Marshall filed his charge of retaliation in district court, the defendants in the case moved for summary judgment, claiming that qualified immunity protected them from the retaliation claim. The motion was denied and the defendants appealed to the Seventh Circuit Court of Appeals. *Id.* at 789-90.

The Seventh Circuit Court of Appeals found that the plaintiff's statements involved a matter of public concern. It first reiterated that not merely the content of given speech, but "'the point of the speech in question'" was to be evaluated. *Id.* at 794 (quoting *Callaway v. Hafeman*, 832 F.2d 414, 417 (7th Cir. 1987)) ("[T]he *Connick* test requires us to look at the point of the speech in question: was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?" (Internal citations omitted)). The Seventh Circuit Court of Appeals then stated that both the content and the point of the speech in question indicated that Marshall's speech involved matters of public concern:

> . . . Prior to [June 1988], this court had decided *Yatvin v. Madison Metropolitan Sch. Dist.*, 840 F.2d 412, 419 (7th Cir. 1988), which dealt with a claim of retaliation for filing a charge of sex discrimination. In *Yatvin*, the panel noted that "[s]ex discrimination is a matter of public concern, obviously debate over it is protected by

---

[28] It is also the case that the Plaintiff's complaints about harassment of *non-employee* students are clearly not made in her role as anything other than a citizen, as, in such circumstance, she is not complaining about an employment practice suffered by any other individual. *See Deremo v. Watkins*, 939 F.2d at 910.

the First Amendment." *Id.* Similarly, *Callaway v. Hafeman*, 832 F.2d 414, 417 (7th Cir. 1987), stated that it was "undoubtedly true that incidences of sexual harassment in a public school district are inherently matters of public concern." *See also Connick*, 461 U.S. at 148 n. 8, 103 S.Ct. at 1691 n. 8 (describing as involving "a matter inherently of public concern" the speech at issue in *Givhan v. Western Line Consolidated Sch. Dist.*, 439 U.S. 410 [] (1979), where an employee protested racial discrimination privately to her employer). Reinforcing our conclusion that the alleged gender discrimination at issue was of public concern is the fact that both the allegations and the subsequent terminations had received coverage in the Chicago newspapers and had been the subject of a press conference held by several women's interest organizations prior to Mr. Marshall's firing. *See Auriemma*, 910 F.2d at 1460 (noting that newspaper story was some evidence of public interest and concern).

Likewise, we believe that the form and context of Mr. Marshall's alleged speech clearly established its public character. Although the speech appears primarily to have occurred in the office, this fact does not prevent it from relating to a matter of public concern. Prior to June 1988, the Supreme Court had decided *Givhan* and *Connick* in which statements made in a work environment were found to relate to matters of public concern. In addition, some of Mr. Marshall's speech was directed in part at General Counsel Thomas and Mr. Fusco, who were involved in the Cary plaintiffs' grievances and would have been persons to whom speech regarding the case would have been most forcefully directed.

*Id.* at 795-96. Similarly here, the Plaintiff's speech touched on a matter of public concern.

## 2. **Whether the College's interest in the "effective and efficient fulfillment of its responsibilities to the public" outweighs the Plaintiff's interest in speaking**.

Determining that Bevill's speech touched on a matter of public concern does not complete the inquiry into whether the Plaintiff was protected by the First Amendment from Abrams's termination of her and Watkins's ratification of the decision to terminate her. The issue next to be resolved is "whether the employee's interest in speaking outweighs the government's legitimate interest in efficient public service." *Beckwith v. City of Daytona Beach Shores, Fla.*, 58 F.3d at 1564; *See Pickering v. Board of Education*, 391 U.S. at 568. "In performing this balancing test, a court must consider several factors: (1) whether the speech at issue impeded the government's ability to perform its duties effectively; (2) the manner, time and place of the speech; and (3) the context within which the speech was made." *Fikes v. City of*

*Daphne*, 79 F.3d 1079 (11th Cir. 1996). "In addition to these factors, the court must also consider the nature of the employee's job, *Bates v. Hunt*, 3 F.3d 374, 378 (11th Cir. 1993) [*See also Kinsey v. Salado Independent School Dist.*, 950 F.2d 988 (5th Cir. 1992) (en banc )], and the nature of the employer's mission. *Busby v. City of Orlando*, 931 F.2d 764, 774 (11th Cir. 1991)." *Flood v. State of Alabama Dept. of Indus. Relations*, 948 F.Supp. 1535, 1543 (M.D. Ala. 1996).[29]

In *Tindal v. Montgomery County Com'n*, 32 F.3d at 1540, the Eleventh Circuit Court of Appeals addressed the issue of whether a plaintiff's speech about harassment in the police office was outweighed by countervailing concerns of the department:

> The second part of the *Bryson* [*Pickering*] test, as applied in this case, asks whether Tindal's interest in her speech in the district court outweighed the state's interest in promoting efficient public service. *Bryson*, 888 F.2d at 1565 (*quoting*

---

[29] In this vein, the Eleventh Circuit Court of Appeals has marked out a set of employees whose First Amendment protection from retaliation is "thinner" than that of other employees — "the confidential employee and the policy-making employee," as well as "the employee whose job requires extensive public contact on the employer's behalf." *Bates v. Hunt*, 3 F.3d at 378. While the Eleventh Circuit Court of Appeals has characterized these employees as having lessened First Amendment protections from employer retribution, the "thinness" of First Amendment protection is a factor not of the subjects on which those employees can complain or address matters of public concern, but of the manner in which those concerns must, at least as an initial manner, be presented to the employer. Where an individual is employed in a policymaking, confidential or public role, explosive speech by such an official is likely to cause disruption or the withering of confidence in the governmental entity. *See McVey v. Stacy*, 157 F.3d 271, (4th Cir. 1998) (per Niemeyer, Circuit Judge, with two Judges concurring in part and concurring in the judgment) (comparing higher-level and public positions to political patronage positions and noting the limited protections granted to individuals in both). "Put differently, the government employer's interest in staffing its offices with persons the employer fully trusts is given great weight when the pertinent employee helps make policy, handles confidential information or must speak or act — for others to see — on the employer's behalf." *Shahar v. Bowers*, 114 F.3d 1097, 1103-04 (11th Cir. 1997), *cert. denied*, — U.S. —, 118 S.Ct. 693 (1998). An employee in such a position who disagrees with the policies of that governmental entity may, as a practical matter, be left out of future decisions on which that employee was hired to advise because of his airing of disagreements and the employee may thereby become useless to the governmental agency. Whatever the wisdom of branding as pariahs the critics of a governmental agency's policies, disruption does result. As a consequence, it is the rare case in which an individual in such a position will be protected by the First Amendment in speaking publicly against a governmental actor or its policies.

*Pickering v. Board of Educ.*, 391 U.S. 563, 568 [] (1968)).  Courts have recognized that some speech, even though about a matter of public concern, may unreasonably disrupt the efficient conduct of government operations;  in order to promote efficient public service, therefore, government employers may take action against employees who engage in such disruptive speech.   Specifically, Tindal would merit no First Amendment protection if her speech "so severely impeded [her] own effectiveness and the effectiveness of [the Sheriff] that the governmental interest at stake in this case [e.g., efficient operation of the Sheriff's office] clearly outweigh[ed Tindal's] speech interest."  *Morales v. Stierheim*, 848 F.2d 1145, 1151 (11th Cir. 1988), *cert. denied*, 489 U.S. 1013 [] (1989).  As observed above, Tindal clearly had an interest in her speech describing the discrimination present in the Sheriff's office.  The state interest half of the balance, however, is empty:  *Butler has proffered no evidence indicating that Tindal's speech inhibited either her work or the work of the office.*  Tindal satisfies this part of the *Bryson* test.

(Emphasis added.)

While the defendants in *Tindal* failed to articulate and present evidence of any interests that were hampered or limited by the plaintiff's speech, Watkins and Abrams assert that the Plaintiff's First Amendment interest in the display of the copies of photographs to Morgan and her speech regarding Pickering's alleged harassment of students in UAB's investigation was outweighed by the College's interest in handling the matter confidentially and in protecting the student who was photographed from harm — the College desired sensitivity to the situation because if the allegations were true, it might harm students who did not wish to be pulled into the limelight as having been harassed and if not true, the allegations could further sully the already tarnished name of Pickering to an irreparable degree.[30]  The Plaintiff responds, citing *Beckwith v. City of Daytona Beach*, 58 F.3d at 1564, that the College could have no interest in suppressing the content of the plaintiff's speech which would outweigh the public interest in the concerns Bevill expressed.  However, the weighing of interests in a case such as this is not between the interests of the government in limiting or controlling the content of the plaintiff's

---

[30]  These are not legitimate non-discriminatory reasons for the decisions of Watkins and Abrams and should not be read as such.  Rather, they are articulated government reasons for why the speech disrupted UAB's ability to efficiently and effectively perform its public functions.

speech and the public character of the speech; rather, it is a balancing of the government's interest in promoting its efficiency and effectiveness against the interest of the plaintiff in engaging in a particular type and manner of speech. *See Pickering v. Board of Education*, 391 U.S. at 568.

There are, essentially, two ways in which a plaintiff's speech might disrupt the efficiency and effectiveness of the government. First, the speech may, in and of itself, disrupt the ability of the governmental body to pursue one of its purposes or duties. For example, an allegation that a County tax collector is pilfering from the public till would engender suspicion about the collector's department and increase resistance to revenue collection.[31] Second, as a consequence of an employee's speech, other members of the governmental body may find it practically difficult to interact with the speaker, as would be the case, for example, if an assistant district attorney voiced vocal opposition to a decision not to prosecute particular individuals.[32] These two types of interests often bleed together. In the instant case, the interests voiced by Defendants Abrams and Watkins for limiting the Plaintiff's expression were of the former sort, i.e., that the Plaintiff's anti-harassment action was disruptive of the College's duty to protect its students and teachers from unwarranted intrusions into their privacy.

The Plaintiff contends that she publicly spoke to no one other than Morgan and only to her because she was an individual who could get word of Pickering's behavior to Abrams. A

---

[31] However, this interest of the government would not automatically weigh substantially against an employee's interest in voicing opposition to public corruption.

[32] This latter interest would seem to be a relatively weak one. Dissent is a requirement of a democracy; any government office that cannot tolerate a reasonable degree of dissent within its own ranks may its authoritarian reach into the public sphere, as no contrarian voice is present to protect or explain opposing interests before a one-sided policy decision is made. *But see Connick v. Myers*, 461 U.S. at 151-52 ("When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate.").

reasonable trier of fact could determine that the Plaintiff conducted herself in a manner calculated to keep the issue of harassment discreet and to limit damage to the reputation of any individual or the College. Contrary to the assertions of Defendants Abrams and Watkins, therefore, there exists a genuine issue of triable fact that the Plaintiff's actions did not implicate the valid interests of the College in making certain that its students and teachers were protected from unnecessary intrusions and embarrassment. *Tindal v. Montgomery County Com'n*, 32 F.3d at 1540. The Plaintiff is not a high-level employee of the College whose vocal expression of dissent would create a distrust in the College that would hamper its effective functioning, nor is she an employee, such as an EEO counselor, whose position requires her to keep matters such as the instant one confidential. *See Bates v. Hunt*, 3 F.3d at 378. In addition, the Plaintiff's speech did not impair the investigation of either Abrams or UAB into the harassment allegations. Reading the facts most favorably to the Plaintiff, her statements to the person she believed could inform Abrams of Pickering's conduct helped to prompt the investigation into an activity that positively impacted the College's ability to effectively and efficiently perform its primary purpose of providing an environment conducive to the edification of the College's students by spurring an investigation into a possible source of student sexual harassment. *See Fikes v. City of Daphne*, 79 F.3d at 1084 (stating that the plaintiff's "attempts to expose police malfeasance helped further the municipality's responsibility to provide effective law enforcement services"). Finally, read in the light most favorable to the Plaintiff, the facts support the inference that the Plaintiff "chose to express [her] accusations at a 'time, place, and manner' so as to minimize possible disruptions" to the College. *Id*.

If, as the Plaintiff alleges, Abrams terminated her because of her speech during the investigation by UAB, as well as because of her "public" speech about Pickering's conduct, a reasonable inference could be made that Abrams terminated the Plaintiff not because of the manner in which she stated her concerns, but based purely upon the content of her commentary. Similarly, if the ratification of the termination in the grievance proceeding by

Watkins was based upon her speech in the investigation as well as her "public" display of copies of the photographs, a reasonable inference could be drawn that Watkins's decision not to reinstate the Plaintiff was based purely on the *content* of her speech. If so, the interests stated by Abrams and Watkins in efficiency and economy which address only the *manner* of the Plaintiff's speech, rather than its content, fail, because the Plaintiff can raise a genuine issue of triable fact that she was terminated and denied reinstatement based upon the *content* of the speech, not the time, place or manner of its utterance. In other words, if the Plaintiff can demonstrate at trial that the efficiency concerns advanced by Abrams and Watkins were not the genuine time, place or manner interests which led to the employment decisions at the time they were made and that, instead, the employment actions were taken on the basis of the content of the speech, the Plaintiff will prevail on this part of the *Pickering-Connick* analysis, as the Defendant has no legitimate countervailing interest to her interest in speaking on a matter of public concern. The Plaintiff presented a genuine issue of triable fact that the College's stated interests either were not the interests motivating the employment decisions or were clearly outweighed by the Plaintiff's interest in displaying the copies of photographs to Morgan and in telling investigators about Pickering's harassment of students.

## 3. Whether the Plaintiff's speech played a substantial role in the employment decision.

Under *Beckwith v. City of Daytona Beach Shores, Fla.*, 58 F.3d at 1563-64, a plaintiff is required to demonstrate not only that her speech touched on a matter of public concern and that her interest in speaking was not outweighed by the government's interest in efficiency and effectiveness in the administration of its public functions, but also that her speech played a substantial role in the challenged employment decision. Regarding Abrams, the Plaintiff clearly raises a genuine issue of material fact that her speech regarding Pickering's activities played a substantial role in his termination of her. *See id.* at 1564 (holding that an employee's burden of showing that her speech was a "substantial" or "motivating" factor in the decision to terminate

her "is not a heavy one"). However, the Plaintiff has a more difficult case with respect to Watkins; while a reasonable trier of fact could find that the Plaintiff's speech played a role in Watkins's decision to ratify the Plaintiff's termination, it is by no means clear that his ratification of her termination as a part of her grievance process constitutes an actionable employment decision. As best as can be determined, the issue of whether ratification of a termination in a grievance proceeding can constitute an "employment decision" for purposes of a First Amendment retaliation claim is a matter of first impression in this circuit.

In *Rutan v. Republican Party of Illinois*, 497 U.S. 62, (1990), the Supreme Court addressed, in the context of a political patronage case, what types of employment decisions are actionable under the First Amendment. In that case, the Seventh Circuit Court of Appeals had denied the claims of the plaintiffs on the grounds that "only those employment decisions that are the 'substantial equivalent of a dismissal' violate a public employee's rights under the First Amendment." *Id*. at 75 (citing 868 F.2d 943, 954-957 (7th Cir. 1989)). The Supreme Court rejected this narrow construction of an employment decision challengeable under the First Amendment. Stating that while "[t]he First Amendment is not a tenure provision, protecting public employees from actual or constructive discharge," *id*. at 76, it prevents not only termination on the basis of certain First Amendment activity, but also the dispensation of "promotions, transfers, and rehires" on those same grounds. *Id*. at 75. Further, the Court noted, in a lively bit of dicta, "the First Amendment, as the court below noted, already protects state employees not only from patronage dismissals but also from 'even an act of retaliation as trivial as failing to hold a birthday party for a public employee . . . when *intended to punish* her for exercising her free speech rights.'" *Id*. at 75 n.8 (citing 868 F.2d, at 954, n. 4.) (emphasis added).

While *Rutan* involved only the issue of political patronage, several circuit courts of appeals addressing the issue have applied its statements regarding covered employment decisions "to cases involving public employer retaliation for employees' exercise of their free

speech rights." *Colson v. Grohman*, 174 F.3d 498, 509 (5th Cir. 1999). *See Bernheim v. Litt*, 79 F.3d 318, (2nd Cir. 1996) (stating that harassment, promotions and other unfavorable gestures by school principal could constitute adverse employment decisions in retaliation for First Amendment activity); *Click v. Copeland*, 970 F.2d 106, 110-111 (5th Cir. 1992) (holding that *Rutan* applies in a First Amendment retaliation claim based upon expression); *Sharpe v. Cureton*, 172 F.3d 873 (Table), 1999 WL 55274 (6th Cir. 1999) (unpublished opinion) (applying *Rutan* to a First Amendment retaliation claim); *Dill v. City of Edmond, Oklahoma*, 155 F.3d 1193, 1204 (10th Cir. 1998) (same). In *Hatcher v. Board of Public Education and Orphanage for Bibb County*, 809 F.2d 1546, 1556 n. 19 (11th Cir. 1987), the Eleventh Circuit Court of Appeals, in an opinion prior to the decision of the Supreme Court in *Rutan*, indicated that an "employment decision" covered by *Connick* was roughly equivalent to an "adverse employment action." In *Hatcher*, the school principal had refused to recommend the plaintiff for a vacant principalship because of protests regarding a school closing plan. In remanding the claim to the district court, the Eleventh Circuit Court of Appeals instructed the district court to determine whether the speech in question was a substantial or motivating factor in the refusal of a recommendation only on the grounds of general causation. *Id.* at 1558. The Eleventh Circuit Court of Appeals did not turn away the claim because the refusal of a recommendation was not a protected employment action. Later, in *Beckwith v. City of Daytona Beach Shores, Fla.*, 58 F.3d at 1563, the Eleventh Circuit Court of Appeals stated the breadth of First Amendment protection from retaliatory action. In rejecting an argument that to prevail on a First Amendment retaliation claim a plaintiff must demonstrate that she was denied a protected life, liberty or property interest, the *Beckwith* court stated that "although a retaliatory discharge claim by a state employee involves the denial of the state-created benefit of employment, the right upon which a retaliatory government employment decision infringes is the right to free speech, not the right to a job." *Id.*

From these cases, some rules of thumb emerge about what constitutes an "employment decision" for purposes of the *Pickering-Connick* test. First, an employee's retaliation claim is not limited to circumstances in which the employee was terminated; it also includes, but is not restricted to, cases in which an employee is refused a promotion or rehiring, or is transferred because of engaging in protected speech. Second, it appears that while the term "employment decision" in a First Amendment retaliation claim is close kin to the term "adverse employment decision" utilized in employment discrimination cases — for example, both involve common employment decisions — in an important respect the two are greatly different. The employment discrimination statutes are directed toward preventing an employer from making decisions that would affect the work status of an employee based upon her being a member of a protected class or engaging in protected activity. As has been stated by the Eleventh Circuit Court of Appeals, "not 'every unkind act' amounts to an adverse employment action." *Doe v. Dekalb County School District*, 145 F.3d 1441, 1448 (11th Cir. 1998). This includes "unkind" or non-employment-related "punishment" based upon membership in the protected class or engagement in a protected activity. Therefore, an "adverse employment action" under an employment discrimination statute is an action altering an employee's terms, conditions or privileges of employment —, i.e., those actions that a reasonable employee would view as *adverse*. A claim of retaliation in violation of the First Amendment is meant to prevent an employer from either punishing an employee based upon her constitutionally protected expression or attempting to "chill" the employee's expression of constitutionally protected speech. *See Rutan v. Republican Party of Illinois*, 497 U.S. at 75. An "employment decision" actionable under the First Amendment would therefore have to be, at a minimum, one that was reasonably calculated to chill or to punish an employee for the employee's exercise of her First Amendment rights. If the employment action is not one that could be viewed by a reasonable person in the same circumstances as chilling or punishing First Amendment protected

expression, it is not an "employment decision" on which a First Amendment claim can be based.[33]

In the instant case, the ratification of the Plaintiff's termination could constitute an "employment decision" impermissible if motivated by the Plaintiff's having engaged in constitutionally protected expression. First, the ratification is sufficiently similar to a decision not to rehire that it would be a covered decision. Second, while facts permitting an inference that the decision of Watkins to ratify the termination was reasonably calculated to punish the Plaintiff for engaging in constitutionally protected expression are meager, a reasonable trier of fact could conclude that such it the case. The Plaintiff has stated a claim against Watkins under the present substantive law regarding First Amendment retaliation claims.[34]

## B. QUALIFIED IMMUNITY.

Abrams and Watkins contend that they cannot be held liable for any First Amendment violation because they are protected by qualified immunity from an action for damages. In *Lassiter v. Alabama A & M University, Bd. of Trustees*, 28 F.3d 1146, 1149-51 (11th Cir. 1994) (en banc), the Eleventh Circuit Court of Appeals crafted general rules governing the qualified immunity analysis in this circuit. Each of these general rules will be examined before the particular claims of qualified immunity presented in this case are addressed.

---

[33] For example, a transfer that might not qualify as an adverse employment action under Title VII because the employee would receive the same pay, perform the same duties, and so forth, might be an employment decision which is impermissible if substantially motivated by the plaintiff's First Amendment protected activity, as a reasonable person in the circumstances could comprehend the transfer as a punishment for protected speech or an attempt to "chill" that speech by moving the individual from a position in which that speech would be pertinent.

[34] The Plaintiff has raised a genuine issue of material fact rebutting a *Mt. Healthy* defense of either Abrams or Watkins.

"I. Qualified immunity protects government officials performing discretionary functions from civil trials (and the other burdens of litigation, including discovery) and from liability if their conduct violates no 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* at 1149 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) and citing *Siegert v. Gilley*, 500 U.S. 226, 231-33 (1991)). It provides a shield to officers performing the discretionary functions of their jobs from liability for *damages*, not injunctive relief, arising out of questionably unconstitutional or statutorily prohibited conduct. *See D'Aguanno v. Gallagher*, 50 F.3d 877, 879 (11th Cir. 1995) (reversing district court in part, stating that "because qualified immunity is a defense only to claims for monetary relief, the district court erred in granting summary judgment on plaintiffs' claims for injunctive and declaratory relief"). Those aspects of the officer's job deemed to be purely "ministerial" or that lie outside the scope of the officer's discretionary job functions are not protected;[35] but, where

---

[35] In *Jordan v. Doe*, 38 F.3d 1559, (11th Cir. 1994), the Eleventh Circuit Court of Appeals described what constitutes a "discretionary function" entitling an officer to assert qualified immunity in a given case:

> In *Rich v. Dollar*, 841 F.2d 1558 (11th Cir. 1988), we acknowledged that *Zeigler* provided no guidance for determining whether a government official's conduct fell "'within the scope of his discretionary authority.'" *Id.* at 1564. Relying on pre-*Harlow* cases from this circuit, however, we then defined "discretionary authority" in this manner:
>
> > [A] government official can prove he acted within the scope of his discretionary authority by showing 'objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority.'
>
> *Id.* (quoting *Barker v. Norman*, 651 F.2d 1107, 1121 (5th Cir. 1981)). We thus interpreted the term "discretionary authority" to include all actions of a governmental official that (1) "were undertaken pursuant to the performance of his duties," and (2) were "within the scope of his authority." *Rich*, 841 F.2d at 1564.

The extent of the authority is apparently limited, at its broadest levels, by state law definitions of the officer's general authority and within those limits by delegations of authority from those who do have the discretionary authority under state law. *See Rich v. Dollar*, 841 F.2d at 1564 (finding defendant acting within the scope of his authority as he was acting "within the authority delegated to him by his employer, the State Attorney"). *See Griswold v. Alabama Dept. of Industrial Relations*, 903 F.Supp. 1492,

an officer is called upon to use his good judgment in the execution of his duties, he is protected from the burden of suits where his judgments were within the boundaries of then-defined constitutionally or statutorily permitted conduct. *See Harlow v. Fitzgerald*, 457 U.S. at 818.[36] *Green v. Brantley*, 941 F.2d 1146, 1150 (11ᵗʰ Cir. 1991)("*Harlow* recognized that for defendant officials, a pending civil rights lawsuit is a sword of Damocles.").

"II. That qualified immunity protects government actors is the usual rule; only in exceptional cases will government actors have no shield against claims made against them in their individual capacities." *Lassiter v. Alabama A & M University, Bd. of Trustees*, 28 F.3d at 1149 (citing *Harlow v. Fitzgerald*, 457 U.S. at 818). The shield provided by qualified immunity is designed to protect all but the most brazen violators of a plaintiff's constitutional or statutory rights or those whose incompetence is without question from being held liable for a constitutional or statutory violation. *Id* ("Unless a government agent's act is so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit."). District courts have been cautioned to "think long and hard before stripping defendants of immunity." *Id*. This is certainly not an admonishment to a district court to wax philosophical before exposing a defendant to liability for a violation of § 1983 where it should clearly be denied. However, it appears that the case law in this circuit requires district courts to pay careful attention to the facts and law relevant to the constitutional violation at issue and

---

1498 (M.D. Ala. 1995) (describing *Jordan v. Doe*).

[36] "When a defendant government official raises the defense of qualified immunity, first he must prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" *Suissa v. Fulton County, Georgia*, 74 F.3d 266, (11ᵗʰ Cir. 1996) (citing *Sammons v. Taylor*, 967 F.2d 1533, 1539 (11ᵗʰ Cir. 1992)). However, "the showing that a defendant official must make to avail himself of the qualified immunity defense varies depending upon the degree of discretion that he exercises in performing his official duties." *Douthit v. Jones*, 619 F.2d 527, 534 (5ᵗʰ Cir. 1980) (characterizing the range of discretion given officers as broad). Only after this showing is made need the plaintiff demonstrate that the defendant is not entitled to qualified immunity. *Id*.

not deny qualified immunity where there exists an element of the constitutional or statutory claim on which the plaintiff has not presented sufficient facts that could demonstrate a violation under the relevant clearly established law.  Where the defendant requests qualified immunity on summary judgment, reasonable inferences of fact are to be drawn narrowly in favor of the plaintiff; a broad inference that may be permissible in another setting may not be permissible when qualified immunity is at issue.

"III. For the law to be clearly established to the point that qualified immunity does not apply, the law must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that 'what he is doing' violates federal law." *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  There are two aspects to this requirement, one relating to the level of generality on which the constitutional right is to be established and another relating to what constitutes applicable clearly established law.

> "General propositions have little to do with the concept of qualified immunity." *Muhammad v. Wainwright*, 839 F.2d 1422, 1424 (11th Cir. 1987). "If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1557 (11th Cir.1993), *modified*, 14 F.3d 583 (11th Cir. 1994); *accord Kelly v. Curtis*, 21 F.3d 1544, 1554 (11th Cir. 1994). "The line is not to be found in abstractions — to act reasonably, to act with probable cause, and so forth — but in studying how these abstractions have been applied in concrete circumstances." *Barts*, 865 F.2d at 1194. And, as the en banc court recently accepted:
>
>> When considering whether the law applicable to certain facts is clearly established, the facts of cases relied upon as precedent are important.  The facts need not be the same as the facts of the immediate case.  But they do need to be materially similar. *See, e.g.*, *Edwards v. Gilbert*, 867 F.2d 1271, 1277 (11th Cir.1989).  Public officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases.
>
> *Adams v. St. Lucie County Sheriff's Dept.*, 962 F.2d 1563, 1573, 1575 (11th Cir. 1992), (Edmondson, J., dissenting) (emphasis added), *approved en banc*, 998 F.2d 923 (11th Cir. 1993).

*Id* at 1149-50. Factual similarity as described here is not factual similarity for its own sake. Rather, factual similarity acts, in some respects, as an aid to defining, in concrete form, the constitutional or statutory right at issue. To some degree the material similarity requirement is an outgrowth of earlier caselaw of qualified immunity, under which a district court was advised to avoid the question of whether a constitutional violation exists under present law. Under the prior regime, a district court need only look to see if, in another case with materially similar facts, a constitutional or statutory violation had been found. If not, then there was no need to proceed any further; the officer was entitled to qualified immunity.

As district courts have been instructed by the Supreme Court to consider whether a statutory or constitutional violation exists under present law before addressing the issue of qualified immunity, the issue of factual similarity does not serve entirely the same role. Under present law, a court determining whether a statutory or constitutional right exists under present law will be required to analyze the facts of the case and present the factors relevant to determining the existence of the right in some detail. If a statutory or constitutional right is found, the fine-grain contours of the explicated right are to be compared to similar or identical rights described in previous relevant cases to determine whether the specific right recognized in the present case has been clearly established.

Subsequent to *Lassiter*, the Eleventh Circuit Court of Appeals, in *Jenkins by Hall v. Talladega City Board of Education*, 115 F.3d 821, 825 n.4 (11th Cir. 1997) (en banc), *cert. denied*, — U.S. —, 118 S.Ct. 412, 139 L.Ed.2d 315 (1997), noted that "the law can be 'clearly established' for qualified immunity purposes only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose." However, in *Wilson v. Layne* — U.S. —, 119 S.Ct. 1692, the Supreme Court apparently relaxed this requirement, indicating that a plaintiff can demonstrate the existence of clearly established law not only by pointing out "cases of controlling authority in their jurisdiction at

the time of the incident," but also through reference to "a consensus of cases of persuasive authority." *Id.* at 1700.

"For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." *Lassiter v. Alabama A & M University, Bd. of Trustees*, 28 F.3d at 1150. Although reasonable officers are not required to be "creative or imaginative in drawing analogies from previously decided cases," *Adams v. St. Lucie County Sheriff's Dept.*, 962 F.2d, 1563, 1575, they are not to be treated as mindless and unable to draw clear inferences from prior cases in determining whether a constitutional right is clearly established. If prior caselaw clearly establishes each element of a right, even if in different cases, such that all that is required to demonstrate the right in the instant case is to "add together" each of those established elements, the right is clearly established such that no reasonable officer could conclude otherwise.

"IV. Because qualified immunity is a doctrine of practical application to real-life situations, courts judge the acts of defendant government officials against the law and facts at the time defendants acted, not by hindsight, based on later events." *Lassiter v. Alabama A & M University, Bd. of Trustees*, 28 F.3d at 1150 (citing *Hunter*, 502 U.S. at 228, 112 S.Ct. at 537, for the proposition that "the court should ask whether the agents acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be construed five years after the fact"). "V. The subjective intent of government actor defendants plays no part in qualified immunity analysis." *Id.* The reasonableness of the officer is not determined by his "good faith" but by whether a reasonable officer, given the facts as apprehended by the actual officer at the time of the alleged violation, would have known based on either previously explicated Supreme Court, Eleventh Circuit Court of Appeals and

Alabama Supreme Court authority or a persuasive, uncontradicted body of authority from other jurisdictions, that his actions would violate a constitutional or statutory right.

> VI. A decision on qualified immunity is separate and distinct from the merits of the case — a principle illustrated by the Supreme Court's willingness to treat the denial of qualified immunity at summary judgment as an appealable collateral order. *Mitchell*, 472 U.S. at 527-29 [] ("it follows from the recognition that qualified immunity is in part an entitlement not to be forced to litigate the consequences of official conduct that a claim of immunity is conceptually distinct from the merits of the plaintiff's claim that his rights have been violated"); *Green v. Brantley*, 941 F.2d 1146, 1151-52 (11th Cir.1991) (en banc) ("whether the defendant official is entitled to qualified immunity on a particular damage claim is also conceptually distinct from the substantive merits" for purposes of collateral review doctrine). Immunity contemplates exemption from liability that would otherwise exist on the merits.

*Id*. at 1151. See *also Jenkins by Hall v. Talladega City Board of Education*, 115 F.3d at 823.

Abrams and Watkins, citing *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1557 (11th Cir. 1993), *modified*, 14 F.3d 583 (11th Cir. 1994), advance the argument that the law is not clearly established that the Plaintiff's speech is entitled to First Amendment protection because both the determination of whether an individual's speech involves a matter of public concern and the balancing test ensconced in the second prong of the *Pickering-Connick* test are fairly fact-specific determinations. Because of the fact-specific nature of the analysis in this case, Abrams and Watkins argue that it is relatively impossible for a court to craft a bright-line rule which governs other violations that do not involve factually identical circumstances. *See Martin v. Baugh*, 141 F.3d 1417, 1420 (11th Cir. 1998) ("Because both prongs involve legal determinations that are intensely fact-specific and do not lend themselves to clear, bright-line rules, it is nearly impossible for a reasonable person to predict how a court will weigh the myriad of factors that inform an application of the *Pickering-Connick* test."). However, it is not a requirement that the Plaintiff demonstrate absolute factual similarity in a First Amendment case such as the present one. She may also overcome qualified immunity if she can demonstrate that "on the facts of [her] case, no reasonable person could believe that both prongs of the test had not been met. . . ." *Id*. at 1420.

The First Amendment right at issue in this case has been sufficiently defined in relevant detail by prior Supreme Court and Eleventh Circuit decisions, most particularly *Tindal v. Montgomery County Com'n*, 32 F.3d at 1540, such that, reading the facts in the light most favorable to the Plaintiff, no reasonable officer could come to any other conclusion than that the Plaintiff satisfied the first and second prongs of the *Pickering-Connick* test. As has been regularly recognized by the Supreme Court and the Eleventh Circuit Court of Appeals, "the general subject of sexual harassment in the workplace is a matter of public concern." *Morgan v. Ford*, 6 F.3d at 755 n.7. *See Connick v. Myers*, 461 U.S. at 148 n.8 (same regarding race discrimination). Both the instant case and *Tindal* involve the speech related exclusively to another individual's subjugation to sexual harassment. In *Tindal*, the Eleventh Circuit Court of Appeals found that the purpose of the plaintiff's speech indicated a matter of public concern primarily because the plaintiff in that case, as the Plaintiff in the instant case, was not motivated by self-interest. Further, in *Tindal*, the Eleventh Circuit Court of Appeals had determined that the defendant had articulated no interest relevant to the plaintiff's speech as a counterbalancing interest. The Plaintiff in the instant suit can raise a genuine issue of material fact that neither Abrams nor Watkins can present a counterbalancing interest to her speech regarding the harassment of students by Pickering.

Finally, *Marshall v. Allen*, 984 F.2d at 796-97, evidences persuasive authority on the existence of the right at issue here and was recognized by the Eleventh Circuit Court of Appeals as such authority in *Tindal v. Montgomery County Com'n*, 32 F.3d at 1540. As the facts in *Marshall* are materially similar to those presented in the instant case as strongly persuasive authority, *Marshall* defines a clearly established right of which a reasonable officer would have known. *See Wilson v. Layne*, — U.S. at —, 119 S.Ct. at 1699. Qualified immunity will be DENIED on the retaliatory termination claim against Abrams.

However, it was by no means clear at the time of Watkins's ratification of the Plaintiff's termination that the ratification of her termination would constitute an "employment decision"

actionable in the First Amendment context.  Therefore, as to Watkins, qualified immunity will be GRANTED.

## Conclusion

For the foregoing reasons, the Defendants' motion for summary judgment will be GRANTED, in part, and DENIED, in part.  There being no genuine issues of material fact and judgment being appropriate as a matter of law, (1) the Plaintiff's claim against UAB for retaliation arising out of the attempted discontinuation of the Plaintiff's unemployment compensation benefits in violation of Title VII; (2) the Plaintiff's claim against UAB for ratification of her termination in the grievance proceeding in violation of Title VII (to the extent that such exists); (3) the Plaintiff's claim of sexual harassment under Title VII and (4) the Plaintiff's claims for damages against Watkins for retaliation in violation of the First Amendment will all be DISMISSED, with prejudice.  The following claims remain for trial: (1) the Plaintiff's claim against UAB for retaliatory termination in violation of Title VII; (2) the Plaintiff's claim against Dr. Dave Abrams for retaliatory termination under 42 U.S.C. § 1983; and (3) the Plaintiff's claims against Abrams and Watkins in their official capacities for injunctive relief.

DONE and ORDERED this /6th day of August 1999.

H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE